1 | GREGORY P. STONE (Bar No. 78329)
gregory.stone@mto.com
2 | STEVEN M. PERRY (Bar No. 106154)
steven.perry@mto.com
3 | BENJAMIN J. HORWICH (Bar No. 249090)
ben.horwich@mto.com
4 | ZACHARY M. BRIERS (Bar No. 287984)
zachary.briers@mto.com
5 | MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
6 | Los Angeles, California 90071-1560
Telephone:    (213) 683-9100
7 | Facsimile:    (213) 687-3702

MIKE MCKOOL, JR. (*pro hac vice* pending)
mmckool@mckoolsmith.com
DOUGLAS A. CAWLEY (*pro hac vice* pending)
dcawley@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:    (214) 978-1000
Facsimile:    (214) 978-4044

*Attorneys for Ericsson Inc. and
Telefonaktiebolaget LM Ericsson*

8 | COURTLAND L. REICHMAN (Bar No. 268873)
creichman@mckoolsmithhennigan.com
9 | MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
10 | Redwood Shores, California 94065
Telephone:    (650) 394-1400
11 | Facsimile:    (650) 394-1422

12 |

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA

15 |

16 | APPLE INC.,

17 |     Plaintiff,

18 |     vs.

19 | TELEFONAKTIEBOLAGET LM
ERICSSON and ERICSSON, INC.,

20 |

21 |     Defendants.

Case No. 3:15-cv-00154-JD

**DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS FIRST
AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

Judge:    Hon. James Donato
Date:     April 15, 2015
Time:     10:00 a.m.
Ctrm.:    11

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## NOTICE OF MOTION AND MOTION TO DISMISS

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on April 15, 2015, at 10:00 a.m., in Courtroom 11, 450 Golden Gate Avenue, 19th Floor, San Francisco, California, Defendants Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson") will and hereby do move this Court to dismiss without prejudice the First Amended Complaint for Declaratory Judgment (FAC) filed on January 15, 2015, pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Court's discretionary authority to decline to entertain claims for declaratory judgment.

Ericsson asks this Court to dismiss the FAC for lack of subject matter jurisdiction because Plaintiff Apple Inc. ("Apple") seeks declaratory judgments on subsidiary issues that would not completely resolve any justiciable case or controversy actually at stake between the parties and because, at the time Apple filed its original complaint in this case, there was no real and substantial dispute between the parties of sufficient immediacy to warrant declaratory relief.  In the alternative, even if the case satisfies Article III's justiciability standards, Ericsson asks this Court to dismiss the FAC in the sound exercise of its discretion because resolution of Apple's declaratory judgment claims would not serve a useful purpose or resolve the parties' actual controversy arising from Apple's refusal to accept a FRAND license to Ericsson's standard-essential patents.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Luke McLeroy and Kasim Alfalahi filed herewith, the pleadings and papers on file herein, and such other matters and argument as may be properly presented to the Court.

DATED:  February 26, 2015

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP
   GREGORY P. STONE
   STEVEN M. PERRY
   BENJAMIN J. HORWICH
   ZACHARY M. BRIERS

MCKOOL SMITH HENNIGAN, P.C.
   MIKE MCKOOL, JR. (*pro hac vice* pending)
   DOUGLAS A. CAWLEY (*pro hac vice* pending)
   COURTLAND L. REICHMAN

By: _____*/s/ Gregory Stone*_____
    GREGORY P. STONE

Attorneys for Defendants ERICSSON INC. and
TELEFONAKTIEBOLAGET LM ERICSSON

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.    Ericsson Has Developed An Industry-Leading Portfolio Of Essential Patents ......................................................................................................... 2

    B.    The Parties' Licensing Negotiations ........................................................ 4

    C.    The Pending Lawsuits ................................................................................ 5

ARGUMENT ....................................................................................................................... 6

I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION ................................... 7

    A.    The Court Lacks Jurisdiction Over Apple's Complaint Because It Seeks Declaratory Judgments On Subsidiary Issues That Will Not Resolve The Controversy Actually At Stake Between the Parties ................................. 7

    B.    Apple's Claims For Declaratory Judgments Of Non-Infringement Were Not Ripe At The Time Apple Filed Its Complaint ....................................... 9

    C.    Apple's Claims Seeking Declaratory Judgments Of The FRAND Rates For The Patents-In-Suit Are Not Justiciable ................................................. 10

II.    EVEN IF APPLE'S CLAIMS FOR DECLARATORY JUDGMENTS ARE JUSTICIABLE, THIS COURT SHOULD EXERCISE ITS DISCRETION NOT TO ENTERTAIN THEM .................................................................................... 11

    A.    The Court Should Not Entertain A Declaratory Judgment Claim That Will Not "Serve A Useful Purpose" And "Terminate" The Parties' Controversy .......... 12

    B.    Because The Parties' Actual Controversy Concerns Ericsson's Full Portfolio, Adjudicating Apple's Claims About Particular Patents Will Not "Serve A Useful Purpose" Or "Terminate . . . [The Parties'] Controversy" ........... 13

    C.    This Court Should Dismiss Apple's Claims For Declaratory Judgments ............... 15

CONCLUSION .................................................................................................................. 15

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1

# TABLE OF AUTHORITIES

2

**Page**

3

**FEDERAL CASES**

4

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................................ 10

5

6

*Allstate Ins. Co. v. Herron*,
    634 F.3d 1101 (9th Cir. 2011) ......................................................................... 13

7

*Ameritas Variable Life Ins. Co. v. Roach*,
    411 F.3d 1328 (11th Cir. 2005) .................................................................. 13, 14

8

9

*AmSouth Bank v. Dale*,
    386 F.3d 763 (6th Cir. 2004) ...................................................................... 13, 15

10

11

*Apple, Inc. v. Motorola, Inc.*,
    869 F. Supp. 2d 901 (N.D. Ill. 2012),
    *aff'd in part, rev'd in part, vacated in part*,
    757 F.3d 1286 (Fed. Cir. 2014) ....................................................................... 14

12

13

*Apple Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) ............................................................ 4

14

15

*Apple Inc. v. Motorola Mobility, Inc.*,
    No. 11-cv-178, 2012 WL 7989412 (W.D. Wis. Nov. 8, 2012) ........................... 11

16

17

*Calderon v. Ashmus*,
    523 U.S. 740 (1998) ................................................................................. 7, 8, 9

18

*Cisco Sys. Inc. v. Alberta Telecomm. Research Centre*,
    892 F. Supp. 2d 1226 (N.D. Cal. 2012) .............................................................. 7

19

20

*Creative Compounds, LLC v. Starmark Labs.*,
    651 F.3d 1303 (Fed. Cir. 2011) ......................................................................... 2

21

22

*Elecs. for Imaging, Inc. v. Coyle*,
    394 F.3d 1341 (Fed. Cir. 2005) ....................................................................... 12

23

*EMC Corp. v. Norand Corp.*,
    89 F.3d 807 (Fed. Cir. 1996) ............................................................... 12, 13, 15

24

25

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) .................................................................. 11, 14

26

27

*Ericsson Inc. v. Samsung Elecs. Co.*,
    No. 2:06-cv-63, 2007 WL 1202728 (E.D. Tex. Apr. 20, 2007) ........................... 14

28

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF AUTHORITIES
### (continued)

Page

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.*,
   824 F.2d 953 (Fed. Cir. 1987) ................................................................. 7

*Huth v. Hartford Ins. Co. of the Midwest*,
   298 F.3d 800 (9th Cir. 2002) .................................................................. 12

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*,
   599 F.3d 1377 (Fed. Cir. 2010) .............................................................. 7

*InterDigital Comm'ns, Inc. v. ZTE Corp.*,
   No. 1:13-cv-9, 2014 WL 2206218 (D. Del. May 28, 2014) .................... 11

*Jang v. Boston Scientific Corp.*,
   532 F.3d 1330 (Fed. Cir. 2008) .............................................................. 8

*Matthews Int'l Corp. v. Biosafe Eng'g, LLC*,
   695 F.3d 1322 (Fed. Cir. 2012) .............................................................. 11

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ........................................................................ *passim*

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   134 S. Ct. 843 (2014) ............................................................................. 9

*Microsoft Corp. v. DataTern, Inc.*,
   755 F.3d 899 (Fed. Cir. 2014) .......................................................... 13, 14

*Minn. Min. & Mfg. Co. v. Norton Co.*,
   929 F.2d 670 (Fed. Cir. 1991) ..................................................... 12, 13, 14

*Pub. Serv. Comm'n v. Wycoff Co.*,
   344 U.S. 237 (1952) ............................................................................... 12

*Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*,
   497 F.3d 1271 (Fed. Cir. 2007) .............................................................. 15

*Veoh Networks, Inc. v. UMG Recordings, Inc.*,
   522 F. Supp. 2d 1265 (S.D. Cal. 2007) .................................................. 13

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) .................................................................... 2, 12, 15

**OTHER AUTHORITIES**

E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941) ............................ 12

-iii-                                                    3:15-cv-00154-JD

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1

## **INTRODUCTION**

2       Ericsson is a leading innovator in mobile communication technologies, including the latest

3   high-speed data communications technology that supports the vast capabilities of modern

4   smartphones, tablets, and other devices.  Apple is a leading seller of devices that rely on that

5   technology, such as the iPhone.  Ericsson's engineering leadership has yielded a vast portfolio of

6   patents that are essential to practicing modern cellular telecommunication standards—known as

7   2G, 3G, and 4G/LTE—and it has committed (through a standard-developing organization known

8   as ETSI) to offering a license to its portfolio of standard-essential patents on fair, reasonable, and

9   non-discriminatory (FRAND) terms.  Until earlier this year, Apple held a license to Ericsson's

10  portfolio of ▮▮▮▮▮▮▮▮▮▮ patents.  Apple needs a license to Ericsson's entire portfolio

11  of standard-essential patents, it professes to be seeking such a license, and the parties have

12  negotiated exclusively on a portfolio basis.  Yet Ericsson's offers to renew and expand Apple's

13  license on FRAND terms to cover Apple's needs have all been rejected, as have Ericsson's

14  proposals for consensual dispute resolution.  The heart of the dispute is whether Ericsson's offer

15  of a portfolio license to Apple—the royalty rate in particular—was in fact FRAND.  If it was,

16  Apple should accept it (or else expose itself to all the remedies available against a willful

17  infringer).  If it was not, Ericsson will honor its FRAND commitment and revise its offer.

18      The question for this Court is whether the proper way to resolve that dispute—whether

19  Ericsson's offer was FRAND—is through the action Apple has initiated in this Court, seeking

20  declarations about seven U.S. patents out of Ericsson's global portfolio of thousands of patents, or

21  instead through an action Ericsson initiated in federal court in Texas (where Ericsson Inc. has long

22  been headquartered, with more than 2,600 employees, including most of those involved in

23  licensing negotiations with Apple).  In that Texas Action, Ericsson has cut to the heart of the

24  matter by explicitly seeking a declaration that the offer it made to Apple to license its 2G/3G/4G

25  standard-essential patents was, in fact, FRAND and satisfied its obligations under its commitment

26  to ETSI.  By contrast, Apple's suit asks only whether certain products infringe seven Ericsson

27  patents that Apple has plucked out of Ericsson's portfolio, and what the royalty rate on each

28  essential patent would be under Apple's preferred methodology.  And even then, Apple is mum

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

about what would happen after this Court sets the rate:  Will Apple take a license at that rate?
What will the license's other terms be?  How will the FRAND licensing terms be determined for
the vast majority of Ericsson's essential patent portfolio not at issue here?  Apple's tactics are so
divorced from industry practices surrounding FRAND licenses that they can only be a calculated
effort to frustrate the parties' ability to reach a licensing agreement for Ericsson's extensive
portfolio on the FRAND terms Ericsson is committed to and Apple professes to support.  The
claims of Apple's complaint are so deeply misconceived that the Court either lacks jurisdiction
over them, or should exercise its considerable discretion to decline to entertain those claims so that
the parties can productively resolve their actual controversy through the Texas Action.

## FACTUAL BACKGROUND

### A.    Ericsson Has Developed An Industry-Leading Portfolio Of Essential Patents

Ericsson has been at the forefront of innovating each generation of the telecommunications
standards that are the backbone of the cellular industry.  Ericsson has more than 25,000 employees
devoted to research and development (R&D) and invests approximately $5 billion on R&D each
year.  Its efforts have yielded more than 35,000 patents and a similar number of pending patent
applications.  The GSM/GPRS/EDGE ("2G"), UMTS/WCDMA/HSPA(+) ("3G"), and 4G/LTE
standards to which Ericsson has contributed ensure worldwide interoperability among networks,
devices, and operators, and they enable any company to enter the market and sell smartphones
capable of operating on any cellular network.  Declaration of Luke McLeroy ("McLeroy Decl.")
¶¶ 4-5.[1]  Such standards are developed through a competitive process in which a standards-
developing organization (SDO)—here, the European Telecommunications Standards Institute
(ETSI)—supplies a framework in which market participants (like Ericsson) come together to find
novel solutions to technical challenges.  The market participants offer competing proposals, and

---

[1] In deciding this motion, this Court may—indeed, should—consider matters outside the
pleadings.  "[I]n addressing a factual attack to jurisdiction, the court may consider evidence
outside the pleadings and is free to weigh the evidence and satisfy itself as to the existence of its
power to hear the case."  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1315 (Fed.
Cir. 2011) (internal quotation marks and citation omitted).  Similarly, a court must consider the
"facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for
resolution" in deciding whether to exercise its discretion to entertain a declaratory judgment
action. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995).

the best contributions are approved as part of the standard.  *See id.* ¶ 7.  The resulting standards are available to anyone to implement and have been enormously beneficial to new entrants to the cellular industry—like Apple—which can launch competitive products without making a risky and expensive investment in developing the standards.   For example, Apple did not sell a cellular device until June 2007, long after the creation of the 2G and 3G standards.  Nonetheless, because Apple's iPhone took advantage of those open standards (which Apple did not help develop), and because Apple sought and readily obtained licenses—including to Ericsson's ▮ portfolio (*see* p. 4, *infra*)—Apple was able to quickly become a market leader in the cellular phone market.

Ericsson is a leader in cellular standardization, and its proposals have been widely adopted into the 2G, 3G, and 4G/LTE cellular standards.  For example, the European Patent Office named several Ericsson employees as finalists for the European Inventor Award 2014 in recognition of their role in developing the 4G/LTE standard.  Multiple studies analyzing contributions to the 4G/LTE standard have identified Ericsson as the clear leader in approved contributions, with some seven hundred approved contributions to its credit.  *See* McLeroy Decl. ¶¶ 9-10.  Making a proposal, however, comes at great cost and great risk.  The necessary R&D occurs years before any products are sold, and making a proposal means sharing valuable research and innovations with competitors, all with no guarantee that the proposed solution will be incorporated into the standard or that anyone will adopt the standard.

Patent licensing provides a necessary incentive for innovators to take the risk of investing R&D resources into standardization efforts.  *Id.* ¶ 8.  When a contributor offers a technical solution to an SDO, for inclusion in a standard, it typically owns (or anticipates receiving) a patent (or multiple patents) pertaining to its technical solution.  If, as is often the case, it is impossible to practice the standard or make standard-compliant equipment without infringing the patent, the patent is referred to as a standard-essential patent—or simply "essential."  ETSI Intellectual Property Rights (IPR) Policy § 15(1) (McLeroy Decl., Ex. C).  To ensure that standard-essential patents do not hinder access to the standard, ETSI (like other SDOs) requires a patentee to give "an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory (FRAND) terms and conditions" for standard-conforming use

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

of its standard-essential patents.  ETSI IPR Policy § 6.1; *see id.* § 15(4), (5), (8).  The commitment does not extend to use for non-standard-conforming purposes.  *Id.*  French law governs the IPR Policy, *id.* § 12, and courts have held that a party seeking a license to standard-essential patents is a third-party beneficiary of the commitment to offer a license on FRAND terms, *see Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012).

**B.       The Parties' Licensing Negotiations**

In 2007, months before it sold its first iPhone, Apple approached Ericsson and asked for a license to Ericsson's portfolio of ███████████████ patents.  The parties readily negotiated a license on FRAND terms, and on January 14, 2008, shortly after Apple introduced the original iPhone, Ericsson licensed Apple to practice Ericsson's portfolio of ███████ ████ patents until January 14, 2015.  *See* Declaration of Kasim Alfalahi ("Alfalahi Decl.") ¶¶ 6-8 .  In 2008, the 4G/LTE standard was still under consideration, and Ericsson's eventual 4G/LTE patent rights were unknown.  ████████████████████████████ ████████████████████████████████████████████, *see id.* ¶ 9, while stipulating that ███████████████████████████████████████████ ████████████████, *see id.* ¶ 10 (the "█████████████████").

In September 2012, Apple released the iPhone 5, its first product to use the 4G/LTE technology that Ericsson was a leader in developing.  Around that time, Ericsson began negotiating with Apple over ████████████████████████████████████ ████████████████, and extending the term of Apple's license to Ericsson's portfolio of ████████████ patents (which was necessary because ████████████████ ████████████████████████).  Throughout those negotiations Ericsson consistently offered a license to all of Ericsson's standard-essential cellular patents on what Ericsson believes are FRAND terms.  Indeed, ████████████████████████████████████ ████████████████████████████████.  During more than two years of negotiations, Apple never requested a license to any individual patents (or to any subset of patents) from Ericsson's standard-essential portfolio, and ████████████████████ █████████████████████████████████

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1   ████████████████████████████████████.  *See* McLeroy Decl. ¶¶ 15, 16, 17, 20 & Ex. F.

2        Negotiation and licensing of standard-essential patents on a portfolio basis is widespread in

3 the telecommunications industry for good reason.  The entire portfolio is, by definition, "essential"

4 for a licensee seeking to practice the relevant standard.  Alfalahi Decl. ¶ 4; McLeroy Decl. ¶ 12.

5 Portfolios of essential patents owned by major contributors to a standard are typically very large.

6 Ericsson has a portfolio of more than 7,000 patents and patent applications worldwide that it has

7 declared to ETSI may be or may become essential to one or more of the 2G, 3G, and 4G/LTE

8 standards.  McLeroy Decl. ¶ 12.  Because ETSI requires broad declaration of patents that "may be

9 or may become" standard-essential (ETSI IPR Policy § 6.4), not all of those patents will be

10 actually essential at any particular time.  But at this moment, the actually essential patents in

11 Ericsson's portfolio number at least in the hundreds.  *Id.* ¶ 17.  Moreover, the standards and the

12 portfolios are dynamic; new essential patents issue continuously, and license negotiations would

13 never end if industry participants did not adopt portfolio licensing.  Consequently, patent-by-

14 patent licensing is undesirable, impractical, and prohibitively expensive—and it would ultimately

15 stultify the very goals of standardization and FRAND licensing.  Accordingly, in all but the most

16 unusual circumstances, Ericsson's standard-practicing licensees—including Apple under the now-

17 expired License Agreement—take licenses on a portfolio basis.  Alfalahi Decl. ¶¶ 4-5.  Indeed,

18 Apple itself has made clear to ETSI that licenses to standard-essential patents should be taken on a

19 portfolio basis.  *See* McLeroy Decl. ¶ 18 & Ex. E (Nov. 11, 2011, Letter from Apple to ETSI).

20      **C.**    **The Pending Lawsuits**

21        The parties had not reached a new portfolio licensing agreement when the 2008 License

22 Agreement, █████████████████████████, expired on January 14, 2015.  That day,

23 Ericsson filed (and then slightly amended) a complaint in federal court where its U.S. operations

24 are headquartered (the Eastern District of Texas) (the "Texas Action").  *See* McLeroy Decl. ¶ 21

25 & Ex. G (First Amended Complaint in Texas Action).  In the Texas Action, Ericsson seeks a

26 declaration that it conducted negotiations with Apple consistent with its obligations, and that the

27 terms on which it offered a license to Apple were consistent with its FRAND commitment under

28 the ETSI IPR Policy.  Thus, Ericsson's complaint presents for resolution the heart of the parties'

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

actual controversy.  Apple could assure a complete resolution of the controversy simply by agreeing that it will accept a global portfolio license on the terms that a court determines are FRAND.  Indeed, Ericsson has offered to bind itself to whatever this Court, or the Texas Court, or an arbitrator determines is FRAND; all that is missing is Apple's agreement to be bound. McLeroy Decl. ¶¶ 19-20 & Ex. F.

Two days earlier, on January 12, 2015—while the License Agreement was still in effect and before the ███████████████████████████—Apple filed a complaint in this Court. Dkt. No. 1.  Apple filed a First Amended Complaint (FAC) on January 15, 2014, through an administrative motion to seal that remains pending.  Dkt. No. 11.  Apple requests declaratory judgments regarding seven particular patents in Ericsson's 4G/LTE-essential portfolio ███████ ████████████████.  FAC ¶¶ 56-148.  Apple's complaint acknowledges that the parties' dispute concerns at least all of Ericsson's 4G/LTE-essential portfolio (*id.* ¶ 12), and Apple asserts that the Texas Action shows that, coming out of their portfolio-based negotiations, the parties "hold starkly different views of FRAND" (*id.* ¶ 14).  Yet Apple's complaint seeks declaratory judgments about only seven patents—(1) that Apple does not infringe those patents; (2) what the royalty rate for each essential patent would be (if computed using Apple's chosen methodology); and (3) a declaration that Ericsson may not obtain injunctive relief based on those patents.  FAC Prayer for Relief ¶¶ 1-3.  It was, however, only *after* filing this lawsuit that Apple asked Ericsson for the rates at which it would license the individual patents in this suit—a request Apple conveyed not through its negotiating team or anyone at Apple, but through its outside litigation counsel in this matter.  McLeroy Decl. ¶ 23 & Ex. H (Feb. 12, 2015, letter from William F. Lee to Douglas Cawley).  And because Apple is coy about whether it would take a license at the rate this Court declares (or what other terms that license might reflect), this Court's judgments may be a dead letter, and Ericsson thus must seek some other way of realizing the fair value of the technology it contributed to the 2G, 3G, and 4G/LTE standards from which Apple now profits.

## ARGUMENT

This Court lacks subject matter jurisdiction over Apple's claims because no ripe controversy existed over infringement of the seven patents when Apple filed its complaint,

because the parties had never discussed FRAND royalties on a patent-by-patent basis, and because Apple has failed to put the parties' actual controversy before the Court as Article III requires.  And even if Apple's claims were justiciable as currently contrived, this Court should nonetheless exercise its considerable discretion to decline to entertain those claims.  The patent-by-patent royalty adjudications Apple seeks, while they might be conventional in routine patent cases, are misguided and unhelpful here, where the parties' controversy is not about what royalty is due if a particular product infringes a particular claim of a particular patent, but rather about the appropriate rate for a portfolio-wide license.  Apple's suit should be dismissed without prejudice so that the parties can litigate their true disagreement in the Texas Action.

## I.     THIS COURT LACKS SUBJECT MATTER JURISDICTION

"[T]he Declaratory Judgment Act requires the existence of an actual case or controversy between the parties before a federal court can constitutionally assume jurisdiction." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955 (Fed. Cir. 1987).  The plaintiff bears the burden to prove the existence of a dispute between the parties that is "real and substantial" and "admi[ts] of specific relief through a decree of a conclusive character." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  Jurisdiction exists only if " 'the case or controversy' actually at stake"— and not merely "a single issue in a dispute"—would be "completely resolved by the declaratory judgment sought." *Calderon v. Ashmus*, 523 U.S. 740, 747-49 (1998).  The "jurisdictional inquiry is concerned with the facts that exist when the plaintiff originally filed its complaint[;] . . . subsequent events cannot make subject matter jurisdiction proper." *Cisco Sys. Inc. v. Alberta Telecomm. Research Centre*, 892 F. Supp. 2d 1226, 1230 (N.D. Cal. 2012) (citing *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1384 (Fed. Cir. 2010)).

### A.     The Court Lacks Jurisdiction Over Apple's Complaint Because It Seeks Declaratory Judgments On Subsidiary Issues That Will Not Resolve The Controversy Actually At Stake Between the Parties

Apple has at best put subsidiary issues before this Court, not the "controversy actually at stake" between the parties.  That dispute is not about the seven hand-picked patents in Apple's complaint, but rather about the terms (particularly the royalty rate) on which Apple will take a license to Ericsson's portfolio of standard-essential patents.  Throughout the parties' negotiations,

1    Apple has sought (and Ericsson has offered) a license to this portfolio, and the parties have never

2    discussed a license to a subset of the portfolio or any individual patent from it.  Even Apple's

3    complaint describes the parties' actual controversy as "whether Apple is currently accruing

4    liability to Ericsson for *any* LTE patent royalties."  FAC ¶ 12 (emphasis added).  The parties have

5    always negotiated over a portfolio license, and never a patent-by-patent license, because Apple

6    ultimately needs such a license, and negotiating on portfolio terms is customary, practical, and

7    efficient.  *See* p. 5, *supra*.  *Apple itself* has recognized that a FRAND commitment contemplates a

8    portfolio license—not a license to individual patents in a standard-essential portfolio.  *See*

9    McLeroy Dec. ¶ 18 & Ex. E (Nov. 11, 2011, Letter from Apple to ETSI) ("A party who made a

10   FRAND commitment to license its cellular standards essential patents . . . must license *those*

11   *patents* at an appropriate rate.  An appropriate rate is one that is reflective of the party's *portfolio*

12   of cellular standards essential patents [relative to others' portfolios].") (emphasis added).

13        This Court lacks subject matter jurisdiction because the portfolio-wide " 'controversy'

14   actually at stake" would not be "completely resolved by the declaratory judgment[s]" Apple

15   requests about particular patents.  *Ashmus*, 523 U.S. at 747-49.  Because Ericsson has agreed to

16   offer its entire 2G/3G/4G-essential portfolio to Apple on FRAND terms, the " 'controversy'

17   actually at stake" is whether Ericsson's actual offer to Apple is FRAND.  The Texas Action

18   squarely presents that dispute.  Apple's claims here do not.  Moreover, declaratory-judgment

19   jurisdiction demands that the actual controversy between the parties "admit of specific relief

20   through a decree of a conclusive character."  *MedImmune*, 549 U.S. at 127 (internal quotation

21   marks, brackets, and citation omitted).  Apple seeks no such decree.  For the same reason that a

22   license to some (but not all) standard-essential patents would not allow Apple to practice the

23   relevant standards, a declaration from this Court about particular patents in Ericsson's larger

24   portfolio would not conclusively resolve the parties' dispute.  At best, the Court's ruling might

25   serve as advice to the parties as they negotiate over the balance of Ericsson's portfolio.  But

26   offering advice is not the office of an Article III court.  *Ashmus*, 523 U.S. at 746; *see Jang v.*

27   *Boston Scientific Corp.*, 532 F.3d 1330, 1336 (Fed. Cir. 2008) ("The Supreme Court has explicitly

28   held that Article III does not permit the courts to resolve issues when it is not clear that the

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

resolution of the question will resolve a concrete controversy between the parties.") (citations

omitted).  And even if the essentiality *vel non* of particular patents is relevant as a subsidiary

matter in resolving the parties' dispute over whether Ericsson's offer is FRAND, Apple's

complaint in this Court artificially—and inappropriately—atomizes that portfolio-level dispute

into patent-by-patent damages litigation.  *Cf. Ashmus*, 523 U.S. at 746-47 (rejecting declaratory

plaintiff's stratagem of "carv[ing] out" a discrete issue to "gain a litigation advantage").

### B.  Apple's Claims For Declaratory Judgments Of Non-Infringement Were Not Ripe At The Time Apple Filed Its Complaint

Even setting aside Apple's failure to frame the parties' actual controversy for resolution,

Apple also cannot show that the artificial sliver it has put before this Court had ripened to a "real

and substantial" dispute "of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment," *MedImmune*, 549 U.S. at 127 (internal quotation marks omitted), at the

time it filed its complaint.  Ericsson did, of course, state during negotiations that those seven

patents (among many others) were standard-essential.  But then Apple jumped the gun by filing its

suit on January 12, 2015, at a time when it enjoyed both (1) ████████████████████

██████████████████████████████████████████████ and (2) the

security of knowing that if it later took a license, the royalty rate would be limited by Ericsson's

FRAND commitment.  Under *MedImmune*, "[t]he relevant question concerns the nature of the

threatened action in the absence of the declaratory judgment suit," *Medtronic, Inc. v. Mirowski

Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014), and at the time Apple filed suit, it faced no

threat from Ericsson.[2]  Apple may attempt to sidestep this by pointing out that it was nonetheless

"accruing liability to Ericsson" for infringement of Ericsson's ███████████ patents.  FAC

¶ 12.  That plea rings hollow, given Apple's decision to sue only after years of "accruing liability"

but just days before ████████████████████ expired.  But more to the point, "accruing

liability" does not itself create a "real and substantial" dispute "of sufficient immediacy,"

---

[2] The justiciable controversy in *MedImmune* emerged from the unfair dilemma—indeed, "coercion"—that a patent licensee would face if bringing suit would require it to first repudiate its license and expose itself to treble damages.  549 U.S. at 134.  But no such "coercion" existed here when Apple filed suit:  It had both ███████████████████████████████ and the promise of royalties being assessed on fair, reasonable and non-discriminatory terms.

1  *MedImmune*, 549 U.S. at 127, over the seven asserted patents.  Commercial parties in an ongoing

2  business relationship are often "accruing liability" to each other, but something more is required

3  before a dispute about accrued liability comes to a justiciable head.  Here, given Ericsson's

4  FRAND commitment, the practical effect of ████████████████ was to defer resolution

5  of the dollar amount owed by Apple until the parties could reach an agreement—or, failing that,

6  until the License Agreement ███████████████ expired and the controversy fully

7  ripened into a concrete dispute about past royalties or damages.

8        The unripeness of Apple's claims is confirmed by the absence of allegation by Apple that

9  it faced concrete commercial uncertainty that would be resolved by a determination of its claims

10  for declaratory judgment.  It does not allege, for example, that judicial confirmation of its

11  infringement would have led it to stop selling iPhones and cellular-capable iPads.  Federal courts

12  do not resolve abstract disagreements of no immediate practical consequence to the complaining

13  party.  *Cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (explaining that a case is unripe

14  until "the legal issue presented is fit for judicial resolution" and the issue presented threatens "an

15  immediate and significant change in the [declaratory] plaintiffs' conduct of their affairs with

16  serious penalties attached").

17

18  **C.**   **Apple's Claims Seeking Declaratory Judgments Of The FRAND Rates For The Patents-In-Suit Are Not Justiciable**

19        Even if a justiciable controversy exists about whether Apple infringes the patents-in-suit,

20  Apple has not pled any facts suggesting there is a dispute between the parties about the royalty

21  rate for those patents-in-suit.  During more than two years of pre-litigation licensing negotiations,

22  Apple *never* requested a license specific to the patents-in-suit, and it *never* asked Ericsson to quote

23  terms on which it would separately license those patents.  McLeroy Decl. ¶ 15.  Not until a month

24  *after* filing suit did Apple ask Ericsson for those terms, and only then through Apple's outside

25  litigation counsel.  *Id.* ¶ 23 & Ex. H (Feb. 12, 2015, letter from William F. Lee to Douglas

26  Cawley).  Apple cannot plausibly contend there was a "real and substantial" present dispute

27  between the parties regarding a royalty for any of the patents-in-suit when it filed its complaint.

28        Moreover, Apple's artfully drafted claims and prayer for relief suggest the complaint is

simply an attempt to shop for an advisory opinion endorsing its view that a per-patent FRAND royalty rate exists, and must be calculated in a particular way.  *See, e.g.*, FAC Prayer for Relief ¶ 2 (seeking not simply "a declaration of a royalty," but a royalty using a particular base and particular rate-setting methodology).  The rigid framework of Apple's proposed royalty computation flatly contradicts governing Federal Circuit damages precedent.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1225-29 (Fed. Cir. 2014).  More importantly, at the moment, it is anyone's guess whether a royalty rate declaration from this Court would actually lead Apple to take a license. Apple might accept a license if it liked the Court's appraisal, or decline a license if it did not. Indeed, Apple has led one court down this path before (much to that court's frustration and Apple's chagrin).  *See Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2012 WL 7989412, at *3 (W.D. Wis. Nov. 8, 2012) (dismissing claim seeking declaration of FRAND rate) ("Perhaps it should have been evident earlier in the case that Apple was seeking only a ceiling on the potential license rate that it could use for negotiating purposes, but it was not. . . .  In effect, Apple was asking the court to assist it in negotiating, not in putting the parties' dispute to rest.").   A further sign that Apple seeks no conclusive decree is that Apple does not ask this Court to declare any *non*-royalty terms of a license.  *See InterDigital Comm'ns, Inc. v. ZTE Corp.*, No. 1:13-cv-9, 2014 WL 2206218, at *3 (D. Del. May 28, 2014) (dismissing claim seeking declaration of FRAND rate) ("All the Court's determination of a FRAND rate would accomplish would be to give a data point from which the parties could continue negotiations.  [Moreover], the determination of a FRAND rate would not lead directly to a patent license as multiple other license issues would still need to be negotiated between the parties, any one of which could become a sticking point.").

## II.    EVEN IF APPLE'S CLAIMS FOR DECLARATORY JUDGMENTS ARE JUSTICIABLE, THIS COURT SHOULD EXERCISE ITS DISCRETION NOT TO ENTERTAIN THEM

"[E]ven if a case or controversy exists, the trial court has significant discretion in determining whether or not to exercise declaratory judgment jurisdiction."  *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1328 n.3 (Fed. Cir.  2012) (citing *MedImmune,* 549 U.S. at 136).  This Court should decline Apple's invitation to adjudicate infringement and royalty claims that are subsidiary to—and which hold no hope of resolving—the far larger actual controversy

between the parties, which is fully presented in the pending Texas Action.

**A.      The Court Should Not Entertain A Declaratory Judgment Claim That Will Not "Serve A Useful Purpose" And "Terminate" The Parties' Controversy**

"Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton,* 515 U.S. at 286.  There is no "presumption in favor of retaining jurisdiction" over a declaratory judgment action.  *Huth v. Hartford Ins. Co. of the Midwest*, 298 F.3d 800, 804 (9th Cir. 2002).[3]  Rather, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.  Accordingly, a court asked to entertain a suit for declaratory judgment should consider the full range of "equitable, prudential, and policy arguments in favor of . . . discretionary dismissal." *MedImmune*, 549 U.S. at 136.  Ultimately, this Court enjoys "special flexibility . . . in the declaratory judgment context," *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 814 (Fed. Cir. 1996), to "make a reasoned judgment whether the investment of judicial time and resources . . . will prove worthwhile in resolving a justiciable dispute," *Minn. Min. & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed. Cir. 1991) ("*3M*").

In that inquiry, courts have often turned to certain especially reliable indications that their effort will be worthwhile—or will instead be a futile exercise that serves only to award one side a bargaining chip while the parties' actual controversy continues unabated.  Courts typically ask whether a declaratory judgment would " 'serve a useful purpose in clarifying and settling the legal relations in issue' " and whether it would " 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' "  *3M*, 929 F.2d at 672-73 (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)); *see Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952) (directing a district court not to entertain a declaratory action unless the

---

[3] Federal Circuit precedent controls "[t]he question whether to accept or decline jurisdiction in an action for a declaration of patent rights in view of a later-filed suit for patent infringement." *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1345 (Fed. Cir. 2005).  Even if that principle applies here (despite the fact that the Texas Action is *not* a "later-filed suit for patent infringement"), other circuits' decisions illuminate the application of the general declaratory judgment principles announced by the Supreme Court to controversies arising outside the patent context.  Accordingly, this motion draws on precedents from various circuits.

"court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them"). Thus, a case that will "resolve all aspects of the controversy in a single proceeding" is preferred over a declaratory action that will "risk duplicative litigation." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011); *accord Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 906 n.4 (Fed. Cir. 2014) (suggesting dismissal is appropriate if it would be "more efficient to confront all the questions at one time and in one place"). Similarly, courts should abstain from issuing declaratory relief if "an alternative remedy that is better or more effective" exists. *E.g.*, *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1331 (11th Cir. 2005); *AmSouth Bank v. Dale*, 386 F.3d 763, 785 (6th Cir. 2004).

Declaratory judgment actions pending against the backdrop of party negotiations and suits in other fora (as Apple's suit is) implicate an additional set of considerations. When the parties are engaged in "ongoing negotiations"—or, by extension, may resume negotiations—a court may find "that the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute." *EMC*, 89 F.3d at 814. That cautious approach preserves not only the court's resources but also its integrity. In *EMC*, for example, the Federal Circuit approved the dismissal of a declaratory judgment complaint that the district court found was an improper "tactical measure filed in order to improve [the declaratory plaintiff's] posture in the ongoing negotiations." *Id.* at 815. Relatedly, a court should dismiss a declaratory judgment action brought "for the purpose of procedural fencing or to provide an arena for a race for *res judicata*," *AmSouth Bank*, 386 F.3d at 785 (internal quotation marks and citation omitted); *accord Allstate*, 634 F.3d at 1107; *Ameritas*, 411 F.3d at 1331. In short, a court should resist deciding a declaratory judgment claim that "is more a bargaining chip than a sincere prayer for relief." *Veoh Networks, Inc. v. UMG Recordings, Inc.*, 522 F. Supp. 2d 1265, 1271 (S.D. Cal. 2007).

**B.     Because The Parties' Actual Controversy Concerns Ericsson's Full Portfolio, Adjudicating Apple's Claims About Particular Patents Will Not "Serve A Useful Purpose" Or "Terminate . . . [The Parties'] Controversy"**

Under these standards, this Court should not entertain Apple's claims. To begin with the obvious: Resolving the merits of Apple's numerous claims would require a considerable "investment of judicial time and resources," *3M*, 929 F.2d at 672. On their face, the seven patents

1    (comprising 30 independent claims) address distinct features of a mobile telecommunications

2    system, *see* FAC ¶¶ 56-61 & Exs. 1-7, so the infringement issues relating to one patent may be

3    irrelevant to the infringement issues relating to another.  Apple has put at least 12 product families

4    at issue (*see* FAC 5 n.1), which multiplies the issues potentially before the Court because even if a

5    given patent is not standard-essential (and thus infringed by all products), it may nonetheless be

6    infringed by a particular product.  And then there would be the question of damages.  To date,

7    damages litigation over FRAND-committed patents has typically entailed complex proceedings

8    involving separate jury and bench trials.  *See, e.g.*, *D-Link*, 773 F.3d at 1213-14 & n.3.  Layered

9    atop those proceedings are questions about expert testimony that have vexed some courts trying to

10   assign damages to individual patents when many more patents are also essential to practicing the

11   standard.  *See, e.g.*, *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 912-13 (N.D. Ill. 2012),

12   *aff'd in part, rev'd in part, vacated in part*, 757 F.3d 1286 (Fed. Cir. 2014).

13           Yet because the parties' actual controversy concerns not just these seven patents but rather

14   Ericsson's *entire portfolio* of patents essential to the 2G, 3G, and 4G/LTE standards, this Court's

15   effort ultimately would not "prove worthwhile," would serve no "useful purpose," and could not

16   "terminate . . . [the parties'] controversy," *3M*, 929 F.2d at 672-73.  *See* pp. 7-9, *supra*.  Moreover,

17   "there is an alternative remedy"—the Texas Action—"that is better [and] more effective" at

18   addressing the parties' actual controversy.  *Ameritas*, 411 F.3d at 1331.  Resolution of the issue

19   framed in the Texas case is far more likely to end the parties' dispute; at the least, it would spur

20   meaningful negotiations.  On the one hand, if Ericsson's offer is found to be FRAND, then Apple

21   should end the parties' controversy by accepting that offer (or Apple could reject that offer at the

22   peril of further cementing its status as a willful infringer).  On the other hand, if Ericsson's offer is

23   found not to be FRAND, it will then be incumbent on Ericsson to continue negotiating with Apple

24   in good faith on terms more favorable to (and thus more likely to be accepted by) Apple.  The

25   Texas Action thus offers a framework within which the parties can "efficient[ly] . . . confront all

26   the questions at one time and in one place," *Microsoft*, 755 F.3d at 906 n.4; *cf. Ericsson Inc. v.

27   Samsung Elecs. Co.*, No. 2:06-cv-63, 2007 WL 1202728, at *3 (E.D. Tex. Apr. 20, 2007) (setting

28   trial for claimed breach of FRAND obligations but staying patent infringement claims because

1   only the former "might alleviate many of the [parties'] primary differences").

2        Apple's suit in this Court, by contrast, offers no similar prospect of ending the parties'

3   controversy on a human timescale.  Apple has chosen to seek the semi-certainty of an advisory

4   opinion about just these seven patents, out of many hundreds of patents Ericsson holds that are

5   essential to the 2G, 3G, and 4G/LTE standards.  At best, the Court's judgment on Apple's claims

6   might give one party or the other an issue-preclusion advantage in future litigation, or perhaps a

7   bargaining chip that would marginally narrow the bid/ask spread between the parties in resumed

8   portfolio negotiations.  But that reveals that this case is little more than a "tactical measure," *EMC*,

9   89 F.3d at 815, or "procedural fencing," *AmSouth Bank*, 386 F.3d at 785, that the Court should not

10  entertain.  Moreover, even if this Court waded in, there is every possibility that Apple will be

11  unmoved by whatever judgment is rendered in this case, and insist that the parties drain the ocean

12  with a teaspoon, seven patents at a time, squandering this Court's resources and their own for

13  years to come.  *See* pp. 10-11, *supra* (discussing jurisdictional perils of adjudicating royalty rates

14  that prospective licensees refuse to commit to be bound to).  "[C]onsiderations of practicality and

15  wise judicial administration," *Wilton*, 515 U.S. at 288, foreclose Apple's wasteful approach.

16      **C.**    **This Court Should Dismiss Apple's Claims For Declaratory Judgments**

17       When a court concludes that entertaining a declaratory judgment action would disserve the

18  "purposes of the Declaratory Judgment Act and considerations of wise judicial administration, it

19  may exercise its discretion to dismiss (or stay)."  *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*,

20  497 F.3d 1271, 1288 (Fed. Cir. 2007).  "[A] stay will often be the preferable course" to avoid the

21  "risk of a time bar," *Wilton*, 515 U.S. at 288 n.2, but Apple is no more threatened than Ericsson by

22  the "risk of a time bar" here.  Dismissal without prejudice is preferable to a stay retaining the case

23  on the Court's docket.  The Texas Action can reasonably be expected to lead to a resolution of the

24  parties' actual controversy, and no present reason exists to believe that process would be aided—

25  now or in the future—by deciding whether Apple's products infringe these seven patents.

26                **CONCLUSION**

27       For the foregoing reasons, the FAC should be dismissed without prejudice.

28

DATED:  February 26, 2015

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP
    GREGORY P. STONE
    STEVEN M. PERRY
    BENJAMIN J. HORWICH
    ZACHARY M. BRIERS

MCKOOL SMITH HENNIGAN, P.C.
    MIKE MCKOOL, JR. (*pro hac vice* pending)
    DOUGLAS A. CAWLEY  (*pro hac vice* pending)
    COURTLAND L. REICHMAN


By:    */s/ Gregory Stone*
    GREGORY P. STONE

Attorneys for Defendants ERICSSON INC. and
TELEFONAKTIEBOLAGET LM ERICSSON

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT