GREGORY P. STONE (Bar No. 78329)
gregory.stone@mto.com
STEVEN M. PERRY (Bar No. 106154)
steven.perry@mto.com
BENJAMIN J. HORWICH (Bar No. 249090)
ben.horwich@mto.com
ZACHARY M. BRIERS (Bar No. 287984)
zachary.briers@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

COURTLAND L. REICHMAN (Bar No. 268873)
creichman@mckoolsmithhennigan.com
MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, California 94065
Telephone:    (650) 394-1400
Facsimile:    (650) 394-1422

MIKE MCKOOL, JR. (*pro hac vice*)
mmckool@mckoolsmith.com
DOUGLAS A. CAWLEY (*pro hac vice*)
dcawley@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:    (214) 978-1000
Facsimile:    (214) 978-4044

*Attorneys for Ericsson Inc. and
Telefonaktiebolaget LM Ericsson*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC.,<br><br>              Plaintiff,<br><br>      vs.<br><br>TELEFONAKTIEBOLAGET LM<br>ERICSSON and ERICSSON, INC.,<br><br>              Defendants. | Case No. 3:15-cv-00154-JD<br><br>**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Judge:    Hon. James Donato<br>Date:     December 11, 2015<br>Time:     11:00 a.m.<br>Ctrm.:    11 |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  LEGAL STANDARD .................................................................................................. 1

III.  '917 PATENT .............................................................................................................. 2

    A.  "offset"  and "hysteresis parameter" (claims 1, 11, 12, 17) ............................... 2

    B.  "mobile radio . . . electronically enabled to . . . measure a radio-related parameter for one or more cells" (claim 1) ...................................................... 5

IV.  '474 PATENT .............................................................................................................. 7

    A.  "prior to decoding of the random access request" (claim 53) .................................. 7

V.  '417 PATENT .............................................................................................................. 9

    A.  "means for generating an algorithm-specific security key" (claim 19).................... 9

VI.  '150 PATENT ............................................................................................................ 10

    A.  "an extension indicator of a second type, indicating whether the data unit or units were non-received or partially received; and, in the case of one or more partially received data units, which parts of those data units that were not received" (claims 1, 13) ..................................................................... 11

    B.  "means for dividing said data units into segments" (claim 13)............................. 14

VII.  '992 PATENT ............................................................................................................ 15

    A.  "a user terminal identifier indicating a scrambling sequence from a first set of uplink scrambling sequences that are not specifically assigned to a user terminal" (claims 1, 7)....................................................................... 15

VIII.  '710 PATENT ............................................................................................................ 16

    A.  Order of the Performance of the Elements (claims 1, 8)....................................... 16

    B.  "radio link controller is configured to: signal the medium access controller that link resources are needed for transmitting data; receive an indication from the medium access controller that link resources for transmitting the data are available; responsive to the indication, generate an error control message based on a current error control status; forward the error control message to the medium access controller for transmission via the radio transceiver; start an error control timer; and refrain from generating further error control messages until the error control timer expires" (claim 8) ................. 18

    C.  "further error control messages" (claims 1, 8) ...................................................... 20

IX.  CONCLUSION ........................................................................................................... 20

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**FEDERAL CASES**

4

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,

5

504 F.3d 1236 (Fed. Cir. 2007) ................................................................................... 19

6

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003) ................................................................................... 17

7

*Broadcom v. Emulex Corp.*,

8

732 F.3d 1325 (Fed. Cir. 2013) ................................................................................... 13

9

*Budde v. Harley-Davidson, Inc.*,
250 F.3d 1369 (Fed. Cir. 2001) .............................................................................. 6, 14

10

*Collaboration Props., Inc. v. Tandberg ASA*,

11

2006 WL 1752140 (N.D. Cal. June 23, 2006) ............................................................... 7

12

*EnOcean GmbH v. Face Intern. Corp.*,

13

742 F.3d 955 (Fed. Cir. 2014) ....................................................................................... 9

14

*IMS Tech. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000) ............................................................................ 10, 20

15

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,

16

256 F.3d 1323 (Fed. Cir. 2001) ................................................................................... 17

17

*Invitrogen Corp. v. Clontech Labs., Inc.*,

18

429 F.3d 1052 (Fed. Cir. 2005) ................................................................................. 1, 8

19

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005) ..................................................................................... 7

20

*In re Katz Interactive Call Proc. Pat. Lit.*,

21

639 F.3d 1303 (Fed. Cir. 2011) ..................................................................................... 7

22

*Linear Tech. Corp. v. Impala Linear Corp.*,

23

379 F.3d 1311 (Fed. Cir. 2004) ..................................................................................... 6

24

*Personalized Media Commc'ns, LLC v. ITC*,
161 F.3d 696 (Fed. Cir. 1998) ....................................................................................... 6

25

*Phillips v. AWH Corp.*,

26

415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... 1, 5, 16

27

*Vitronics Corp. v. Conceptronic, Inc.*,

28

90 F.3d 1576 (Fed. Cir. 1996) ....................................................................................... 1

**TABLE OF AUTHOITIES**
(continued)

Page(s)

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ............................................................................5, 6, 19

**FEDERAL STATUTES**

35 U.S.C. § 112(f) ....................................................................................... *passim*

**OTHER AUTHORITIES**

The Authoritative Dictionary of IEEE Standards Terms, 7th ed. (2000)..........................................8

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## I.    <u>INTRODUCTION</u>

Defendants Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson") respectfully submit their Opening Claim Construction Brief for U.S. Patent Nos. 6,445,917 (the "'917 patent"), 6,985,474 (the "'474 patent"),  7,660,417 (the "'417 patent"), 8,036,150 (the "'150 patent"), 8,169,992 (the "'992 patent"), and 8,214,710 (the "'710 patent").  After briefly setting forth the governing legal standards, this brief explains why the Court should adopt Ericsson's proposed constructions of the 11 terms in dispute.

## II.    <u>LEGAL STANDARD</u>

The starting point for this Court's claim construction analysis is the claim language itself. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1076 (Fed. Cir. 2005). Claim terms are generally given their "ordinary and customary meaning," defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d, 1303, 1313 (Fed. Cir. 2005).  The Federal Circuit deems the specification to be "the single best guide to the meaning of a disputed term."  *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The Court should also consider each patent's prosecution history, to the extent relevant, when construing the disputed terms.  *See Phillips*, 415 F.3d at 1317.  Finally, sources extrinsic to the patent such as dictionaries and expert testimony may also serve as useful aids to the Court "to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."  *Id.* at 1318.

Certain terms at issue are so-called "means-plus-function" terms governed by 35 U.S.C. § 112(f) (formerly § 112 ¶ 6).  According to § 112(f), "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

## III.   '917 PATENT

A mobile device in a cellular network may report its measurements of certain parameters, such as signal strength, to the network for use in handover (that is, deciding when to transfer the call or data session to a different cell) or power control.  The '917 patent relates to "event-based" measurement reporting:  Rather than report certain measurements periodically, the '917 describes having the mobile device report the measurements only when certain events or conditions that would make the measurements relevant are satisfied.  *See* Nettleton Decl. ¶¶ 18-23.

### A.   "offset"  and "hysteresis parameter" (claims 1, 11, 12, 17)

| Ericsson Proposed Construction | Apple Proposed Construction |
| --- | --- |
| "offset":  "amount associated with the individual radio channel or cell of the measured radio-related parameter"<br><br>"hysteresis parameter":  "an amount, associated with a predetermined condition, by which a (possibly offset) measured radio-related parameter must vary from a threshold or other parameter before the predetermined condition is determined to be satisfied, which is used to reduce the volume of reports triggered by that condition" | "offset":  plain meaning<br><br>"hysteresis parameter":  "an amount, associated with a predetermined condition, by which a measured radio-related parameter must vary from another parameter to satisfy the predetermined condition" |

Independent claim 1 requires that the mobile radio be enabled to "add either a positive or a negative offset to the measured radio-related parameter."[1]  The offset radio-related parameter is then evaluated against a predetermined condition to determine if that condition is satisfied and, if so, a report is triggered.  Dependent claim 17 adds the further limitation that the radio be enabled to "employ a hysteresis parameter" when determining whether the condition is satisfied.  At issue is how one of ordinary skill in the art would differentiate between an "offset" and a "hysteresis parameter," both of which must be present for dependent claim 17 to be satisfied.  The specification provides the answer.

The specification describes an "offset" in two ways.  First, an offset may be "associated" with an "[i]ndividual radio channel[]" so as to "allow[] the radio network to change the reporting for an individual channel."  '917 patent, col. 9:59-60, col. 10:7-8.  Consistent with claim 1, this

---

[1] Dependent claims 11 and 12 likewise refer to this "offset."

1   channel-specific offset "may be positive or negative and is added to the measured parameter

2   value" before being evaluated against a predetermined condition. *Id.*, col. 9:60-63. This channel-

3   specific offset is illustrated in figure 10:



4   In this example, the condition is determined to be

5   satisfied at the circled "reporting event" when the

6   measured parameter value for channel CH3 *plus the*

7   *"Offset for CH3"* (the dotted curve representing the

8   sum) begins to exceed the measured parameter value for

9   channel CH1. *Id.*, col. 10:1-6.

10   Second, an offset may be associated with "[a]n individual cell" as "a tool to 'move' the cell

11   border." *Id.*, col. 10:25-26. In other words, by "applying a positive [or negative] offset to a

12   specific cell," a mobile radio can be made to "connect to that cell at a longer [or shorter] distance

13   than otherwise." *Id.*, col. 10:26-28.

14   Hysteresis parameters are described in column 9. "To eliminate the volume of event

15   triggered reports, a hysteresis amount may be associated with an event." *Id.*, col. 9:31-33. This is

16   illustrated in figure 8:



17   Although the measured value for channel CH2 begins to

18   exceed that of CH1 around the middle of the figure, the

19   condition is not determined to be satisfied "until the

20   difference between the measured parameter values for

21   channels CH1 and CH2 reaches a particular amount

22   corresponding to the hysteresis" ("Reporting event 1" in the figure). *Id.*, col. 9:34-38. One of

23   ordinary skill in the art would recognize that a hysteresis parameter is used in this way to require a

24   substantial difference in the parameters before the condition is determined to be satisfied, and thus

25   to reduce the volume of condition-triggered reports. *See* Nettleton Decl. ¶¶ 34-39.

26   As a matter of arithmetic, the hysteresis parameter could be thought of as an amount added

27   to a measured parameter. Thus, in the above example, the difference between the measured

28   parameter values for channels CH1 and CH2 reaching the hysteresis amount is equivalent to the

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

1    measured parameter for CH1 plus the hysteresis amount starting to fall below the measured

2    parameter value for channel CH2.  When thought of in this way, the hysteresis amount appears to

3    resemble an offset, as in both cases an amount (the "Offset for CH3" in figure 10 and the

4    "Hysteresis" in figure 8) is added to the measured parameter value for a particular channel, and

5    then that measured parameter plus its added amount is evaluated against a condition (crossing the

6    measured parameter value for another channel).  It would be a mistake to conflate the two

7    however, because the nature of the amounts and how they are used is very different:  An offset is

8    ***associated with (i.e., specific to) the particular channel or cell*** of the radio-related parameter

9    being measured.  It is used to put a thumb on the scale in favor of or against a particular channel or

10   cell.  *See* Nettleton Decl. ¶¶ 29-32.  A hysteresis parameter, by contrast, is associated with the

11   predetermined condition (also called an "event" in the specification, *see, e.g.*, '917 patent, col.

12   3:34-35)—meaning that the same hysteresis parameter is applied to any measured radio-related

13   parameter (regardless of its channel or cell) when testing for that predetermined condition.  Its

14   purpose is to put a thumb on the scale in favor of the status quo and against reporting that the

15   condition has been satisfied, not in favor or against any particular cell or channel.  It reduces the

16   volume of reports by requiring that any measured radio-related parameter be at least *X* amount

17   more than whatever quantity it would otherwise be compared against in checking whether the

18   reporting condition is satisfied.  *See* Nettleton Decl. ¶¶ 35-41.

19          This distinction is critical.  Apple urges this Court to give "offset" its plain meaning, but

20   Apple's invalidity contentions show that it plans to point to quantities in prior art references that

21   correspond to hysteresis parameters as used in the '917 patent (and that are even explicitly

22   described in those references as "hysteresis" parameters) and to identify them as the "offsets"

23   required for claim 1.  *See, e.g.*, Ex. 1,[2] Apple Invalidity Contentions Ex. A-4 at 7 ("Kuo discloses

24   a mobile station enabled to add the offset HYSTERESIS_RX_PWR to the measured power level

25   of the existing connection frequency"); Ex. 2, U.S. Patent No. 6,181,943 ("Kuo") at col. 3:49-56

26   & 4:11-13 (identifying "HYSTERESIS_RX_PWR" as a "hysteresis threshold value" or

27   _____

28   [2] Citations to exhibits refer to exhibits to the Declaration of Peter A. Detre, submitted herewith.

"hysteresis comparison value" used to minimize "ping-ponging"); Nettleton Decl. ¶¶ 42-43.  The specification makes clear that offsets and hysteresis parameters are distinct, as does the structure of the claims themselves.  *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim [17] that adds a particular limitation [hysteresis parameter] gives rise to a presumption that the limitation in question is not present in the independent claim [1, involving offsets].")[3]

**B.**     **"mobile radio . . . electronically enabled to . . . measure a radio-related parameter for one or more cells" (claim 1)**

| Ericsson Proposed Construction | Apple Proposed Construction |
|---|---|
| Plain meaning.  Alternatively, if deemed to be governed by 35 U.S.C. § 112(f):<br><br>Function:  measuring a radio-related parameter for one or more cells.<br><br>Corresponding alternative structures:  A mobile station, including one or more data processing and control units, transceivers, and antennas, as shown in fig. 1B, electronically enabled to measure a radio-related parameter as shown in fig. 2 (42) and fig. 4 (56) and described in the cited portions of the specification.  *See* '917 patent, col. 6:15- 25; Fig. 1B; *see also* col. 2:41- 54; col. 3:31-33; col. 3:48-52; col. 4:11-15; col. 6:56-62; col. 7:13-20; col. 7:59-65; col. 8:4-12; col. 8:37-41; Fig. 2; Fig. 4. | Should be construed pursuant to 35 U.S.C. § 112(f).<br><br>Function: measuring a radio-related parameter for one or more cells.<br><br>Corresponding structure: indefinite.<br><br>Also invalid as indefinite as claiming both a system and a method. |

The Federal Circuit "has long recognized the importance of the presence or absence of the word 'means'" in determining whether § 112(f) applies to a claim term.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  Because the term at issue here does not include the word "means," there is a presumption that the term is not subject to 35 U.S.C. § 112(f).  *See id.* at 1349.  In order to overcome the presumption, Apple must "demonstrate[] that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Id.*  Whether the claim term does recite

---

[3] Apple's proposed construction for "hysteresis parameter," while similar to Ericsson's, is less precise and less accurate.  The biggest deficiency is that it fails to require that the hysteresis amount be used to reduce the volume of reports triggered by the predetermined condition.  That requirement comes directly from the specification.  *See* '917 patent, col. 9:31-33.  Moreover, one of skill in the art would not consider a parameter meeting Apple's definition to be a "hysteresis parameter" if it were used to make it *easier* for the condition to be satisfied and for the volume of reports to be *increased*; that would be contrary to usage in the art.  *See* Nettleton Decl. ¶¶ 44-49.

1    sufficient structure is judged from the perspective of a person of ordinary skill in the art.  *Id.*

2         Here, a person of skill in the art would recognize a "mobile radio" as structure that may be

3    enabled to measure radio-related parameters.  Nettleton Decl.  ¶¶ 52-53.  Indeed, anyone who

4    owns a mobile phone and has checked the number of bars to determine the strength of the signal

5    being received by the phone understands that one of the functions of such a device is to measure

6    radio-related parameters, such as signal strength.  Because the term "mobile radio" connotes

7    structure sufficient to perform the function specified in the term at issue, § 112(f) is not

8    implicated.  *See, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320–21 (Fed.

9    Cir. 2004) (claimed "circuit" for "monitoring a signal from the output terminal to generate a first

10   feedback signal" connoted structure and was not a means-plus-function term); *Personalized Media*

11   *Commc'ns, LLC v. ITC*, 161 F.3d 696, 702 (Fed. Cir. 1998) (claimed "digital detector" connoted

12   structure and was not a means-plus-function term).

13        Even if § 112(f) were deemed to apply, Apple cannot meet its burden to show by clear and

14   convincing evidence that a person of skill in the art would not understand the specification to

15   disclose corresponding structure.  *See Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77

16   (Fed. Cir. 2001) ("[A] challenge to a claim containing a means-plus-function limitation as lacking

17   structural support requires a finding, by clear and convincing evidence, that the specification lacks

18   disclosure of structure sufficient to be understood by one skilled in the art as being adequate to

19   perform the recited function.").  Figure 1B of the '917 patent shows a "mobile station"—*i.e.*, a

20   mobile radio—including an antenna (35), a transceiver (33), and a data processing and control unit

21   (32).  A person of skill in the art would understand that these components can be used to measure

22   radio-related parameters as further described in the specification.  *See* Nettleton Decl. ¶¶ 53-55.  In

23   particular, the measurement process is set forth in the flow chart in Figure 4 and described in the

24   specification.  *See* '917 patent, col. 7:66 – col. 8:12.

25        Apple also asserts that the term is indefinite because it claims "both a system and a

26   method."  The claim language is clear, however, that the invention is an apparatus, namely a

27   "mobile radio" that is "electronically enabled" to perform certain operations.  The Federal Circuit

28   has held that a claim may be indefinite if the claim language is unclear as to whether infringement

occurs when the claimed system or apparatus is created or when it is actually used.  *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).  But there is no such confusion in cases of language, such as that at issue here, which describes an apparatus and its capabilities, that is, what it is *enabled* to do, but does not require actual use.  *See Collaboration Props., Inc. v. Tandberg ASA*, 2006 WL 1752140, at *7 (N.D. Cal. June 23, 2006) (claim language reciting "input mechanism enabling a user to use" certain information was not indefinite because it "require[d] capability, but not actual use"); *cf. In re Katz Interactive Call Proc. Pat. Lit.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (finding claim indefinite where language in system claim was "directed to user actions, not system capabilities").

## IV.    **'474 PATENT**

The '474 patent relates to the "random access procedure" used in a cellular network to establish a connection between a mobile device and a base station.  The patent describes dividing the random access request into a short preamble (dependent on a signature pattern that allows requests from different devices to be distinguished) and a message part.  In one embodiment, the mobile device waits for an "acquisition indicator" from the base station indicating that it has detected the preamble before sending the message part of the request.  *See* Vojcic Decl. ¶¶ 20-26.

### A.    **"prior to decoding of the random access request" (claim 53)**

| Ericsson Proposed Construction | Apple Proposed Construction |
|---|---|
| Plain meaning.  Alternatively, if construction is deemed necessary: "before the complete random access request has been decoded" | "prior to determining any of the information in, or determining the correct timing on the basis of, the random access request" |

Apple has requested that the Court construe the phrase "prior to the decoding of the random access request," although the meaning of the words in the claim are well-understood and there is nothing in the specification or prosecution history that suggests that the words are being used in anything other than their ordinary sense.  The phrase should receive its plain meaning.

Apple, however, seeks to broaden the ordinary meaning of "decoding" by replacing it with "determining any of the information in or determining the correct timing on the basis of." Apple's proposed construction is overbroad in two ways.  First, a person of ordinary skill in the art would understand "decode" to mean to reverse a process of encoding, not simply to determine

information or timing.  Vojcic Decl. ¶¶ 37-47.  *See*, *e.g.*, Ex. 3, The Authoritative Dictionary of IEEE Standards Terms, 7th ed. (2000) ("decode . . . (2) (data management) To convert data by reversing the effect of previous encoding").  "Determining information in" or "determining the correct timing on the basis of "is not the same as "decoding."  For example, a batter in a baseball game  might determine the correct timing of his swing based on his observation of the flight of the ball, but that would not be considered "decoding" in the ordinary sense of the word, because there has been no process of "encoding" which must be reversed in order for the timing information to be recovered.  There is no redefinition of the term "decode" in the specification or prosecution history to justify Apple's proposed departure from the word's ordinary meaning.

Second, to decode "the random request" plainly means to decode the *complete* random request, not merely "*any* of the information" in it.  Claim construction "necessarily begins with the language of the asserted claims."  *Invitrogen*, 429 F.3d at 1076.  Here, claim 53 makes clear that the "random access request" consists of two parts, an initial "preamble part" followed by "a message part."  To decode "*the* random request" requires decoding all the encoded portions of the random access request, including the message part, because, otherwise, the request would be at best partially decoded.  Vojcic Decl. ¶ 48.  Apple's proposed construction, however, would result in "decoding of the random access," to require only that a portion, no matter how small, of the random access request be decoded.

Not only does the specification fail to support Apple's proposed construction, it is plainly inconsistent with it.  The specification describes an "exemplary detection section" in the base station for detecting the preamble, which, among other things, is capable of determining the signature pattern included in the preamble.  '474 patent, col. 5:36-53.  Indeed, this is required so that the indicator signal sent by the base station upon detection of the preamble can be "associated with the selected signature," as required by claim 53.  *See also id.*, col. 6:35-38 ("where signatures are used in the random access scheme, each acquisition indicator transmitted by a base station can indicate reception of a corresponding signature").  Thus, the base station determines information in the preamble portion of the random access request.  This determination, however, is described as part of the *detection* of the preamble, not the *decoding* of the random access message.

## V.    '417 PATENT

The '417 patent relates to the choice of security keys used to encrypt communications between a mobile device and the cellular network.  In order to provide increased security, the patent describes modifying a basic security key that is agreed on by the mobile device and the network so that it is specific to the security algorithm selected.  *See* Madisetti Decl. ¶¶ 21-26.

### A.    "means for generating an algorithm-specific security key" (claim 19)

| Ericsson Proposed Construction | Apple Proposed Construction |
| --- | --- |
| Function:  Generating an algorithm-specific security key<br><br>Corresponding alternative structures: A module, including one or more processors, for generating an algorithm-specific security key as shown in fig. 1 (modify, 22), fig. 4 (modify, 22), fig. 5 (security enabling nodes) and fig. 6 (BSS); *see also* fig. 2 (step S3); fig. 3 (steps 6, 8); fig. 7 (steps 10, 12); col. 2:23-27; col. 2:50-55; col. 4:45-67; col. 5:42-44; col. 5:51 – col. 6:23; col. 6:62 – col. 7:4; col. 7:48- 51; col. 8:32-63; col. 9:5-9; col. 9:15-29; col. 10:19-23; col. 10:29-40; col. 10:53-57; col. 10:64-67; col 11:15-21; col. 11:40-62; col. 13:17-24. | Function: Modifying a basic security key to obtain an algorithm-specific security key<br><br>Corresponding structure: Hardware or software programmed to use MD5 or SHA1 (with or without HMAC) with the basic security key and the identifier of the enhanced security algorithm as required inputs, and RAND and RES as optional inputs. |

The parties agree that "means for generating an algorithm-specific security key" should be construed according to 35 U.S.C. § 112(f).  Apple's proposed construction is, however, overly narrow, ignoring various alternative structures described in the specification and failing to allow for equivalent structures as required by the statute.

The specification discloses that the algorithm-specific security key is generated by a "modify" module as shown in figures 1 and 4 and that the key modification is "normally performed by a cryptographic modify function."  '417 patent, col. 4:58-59.  The specification also gives several examples of classes of functions that can play the role of the "cryptographic modify function," including "one-way function[s]," "pseudo-random function[s]," and "cryptographic hash functions."  *Id.*, col. 4:58-62.  As set forth in the declaration of Dr. Vijay Madisetti, these classes of functions – that is, algorithms – are well-understood by those of skill in the art and convey structures that can be used to implement the claimed function.  Madisetti Decl. ¶¶ 31-36. *See EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 960 (Fed. Cir. 2014) ("[J]ust because 'the disputed term is not limited to a single structure does not disqualify it as a corresponding structure,

-9-

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

as long as the class of structures is identifiable by a person of ordinary skill in the art.'").

Apple has chosen two particular examples of cryptographic hash functions that are mentioned in the specification – MD5 and SHA1 – as its proposed construction.  *See* '417 patent, col. 8:45-47.  Apple's construction finds no support in the specification or the law.  Indeed, the specification makes clear that MD5 or SHA1 "can be used," but does not exclude other hash functions, pseudo-random functions, or one-way functions.  *Id.*  A person of skill in the art would recognize that specific cryptographic functions, such as MD5 or SHA1, are continually in the process of being replaced by even more secure functions and the inventors would not have intended to limit the patent to particular functions that happened to be popular at the particular time the patent application was filed.  *See* Madisetti Decl. ¶ 37.

Moreover, even if the corresponding structure could somehow be restricted to the specific examples in Apple's construction, Apple ignores that a means-plus-function claim "shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof.*  35 U.S.C. § 112(f) (emphasis added).  Apple allows for *no* equivalents at all in its construction.   Yet, numerous other functions would generate algorithm-specific security keys in substantially the same way (namely, by manipulating the basic security key and information about the algorithm at issue), to achieve substantially the same result (that is, arrive at an algorithm-specific security key that cannot be readily used to recover the basic security key).  Madisetti Decl. ¶¶ 38-39.  *See IMS Tech. v. Haas Automation, Inc.*, 206 F.3d 1422, 1435 (Fed. Cir. 2000) (endorsing "reduced version of the well-known tripartite test for the doctrine of equivalents" to determine the range of equivalents for purposes of § 112(f):  structures are equivalent if they perform the function "in substantially the same way to achieve substantially the same result.").

## VI.   '150 PATENT

The '150 patent relates to status reports sent from a mobile device to a base station (or vice versa) to indicate whether certain data units were or were not properly received.  Because in LTE data units may be segmented, the patent describes a way to specify which parts of data units were not received.  *See* Nettleton Decl. ¶¶ 57-63.

**A.** **"an extension indicator of a second type, indicating whether the data unit or units were non-received or partially received; and, in the case of one or more partially received data units, which parts of those data units that were not received" (claims 1, 13)**

| Ericsson Proposed Construction | Apple Proposed Construction |
|---|---|
| Two separate elements, *i.e.*:<br><br>"an extension indicator of a second type, indicating whether the data unit or units were non-received or partially received; and,<br><br>in the case of one or more partially received data units, which parts of those data units that were not received" | "an extension indicator indicating both (1) whether the data unit or units were non-received or partially received, and (2) in the case of one or more partially received data units, which parts of those data units that were not received" |

The parties dispute whether this term describes two distinct data elements in the claimed format of the status message (Ericsson's proposal), or whether it describes a single data element performing double duty (Apple's proposal).  The claim language, specification, and prosecution history all make clear that this term describes two distinct elements.

*First*, the claims in which this term appears use semicolons to separate each distinct data element of the status message, including the two elements contained in this term:

> … a message comprising:
>
> data acknowledging properly received data units or frames in the form of a certain sequence number;
>
> an extension indicator of a first type;
>
> data regarding a non-received or partially received data unit or frame, in the form of a certain sequence number;
>
> an extension indicator of a second type, indicating whether the data unit or units were non-received or partially received; and, in the case of one or more partially received data units, which parts of those data units that were not received …

'150 patent, claims 1, 13.  Apple's proposed construction alters the grammar of this term by *deleting the semicolon* and adding the word "both," so that (as rewritten) what is being "indicat[ed]" by the second extension indicator no longer stops at the semicolon but instead runs into the second element.  Apple appears to hang its hat on the fact that the two elements composing this term appear in the same paragraph, *i.e.*, no line break further separates them. But this same paragraph goes on to describe yet another data element—an extension indicator of a first type.  There is likewise no line break separating that part of the paragraph, but no one would contend that it should be lumped in as part of the extension indicator of the second type.

*Second*, the dependent claims further confirm the separateness of these two elements of the disputed term (which appears in the two independent claims).  Claim 2 deals with "the information about **whether or not a data unit was partially or non-received**"—the first element—by limiting it to the form of a "flag."  *See also* '150 patent, claim 14; col. 8:50-53.  Claims 3 and 6, on the other hand, separately deal with "the information about **which parts of a [partially received] data unit that were not received**"—the second element—by further limiting the format of that element.  *See also id.*, claims 15, 18; col. 8:54-58.  And claim 12 adds the requirement that the "**extension indicator of the second type** indicates the absence or presence of **information about the beginning and end of non-received data**," *i.e.*, that the first element indicates the absence or presence of the second element.  *See* Nettleton Decl. ¶¶ 74-76; *see also* '150 patent, claim 24.

*Third*, the specification clearly describes the two parts of the disputed claim term as two separate data elements in the status message.  For example, figure 7 depicts these as separate steps: "the status information … includes, as shown in step 710, information about whether data unit or units were non-received or partially received, and if so, as shown in step 715, in the case of one or more partially received data units, which parts of those data units that were not received."  '150 patent, col. 8:44-49.  Moreover, specific embodiments described in the specification use two distinct data structures for these two elements.  *See* Nettleton Decl. ¶¶ 67-73.  For example, the primary embodiment works as follows:  In "the case in which … a data unit has been partially received," "Segment Offset pairs" or "SO pairs" are "used to indicate the first [and last] non-received data octet of the PDU [protocol data unit]."  '150 patent, col. 4:23-30.  These SO pairs correspond to the second element—"in the case of one or more partially received data units, which parts of those data units that were not received."  *See* Nettleton Decl. ¶¶ 68-69.  Separately, "an 'F' bit or flag" "indicate[s] if the data unit to which the NACK refers was segmented [and thus partially received] or not [and thus non-received]."  '150 patent, col. 4:21-24 & 4:45-51.  This F bit corresponds to the first element—"an extension indicator of a second type, indicating whether the data unit or units were non-received or partially received."  *See* Nettleton Decl. ¶69.  The "SO pairs" and the "F bit" are separate data structures within the status message.  *See* '150 patent, fig. 3 ("F" and "SO11"/"SO12"); col. 4:45-49, 4:63-67; Nettleton Decl. ¶ 70.  Apple's construction

would therefore exclude this and other embodiments disclosed in the specification, and should be rejected for that reason.  *See Broadcom v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013).

*Finally*, the file history reinforces the separateness of these two elements.  The '150 application was based on an international (PCT) application originally filed in Sweden.  The relevant claim language from that PCT application references the two distinct elements of figure 7, which clarifies that it is referring to two different data elements:

> the status information which is sent to the sending transceiver includes (710) information about whether the data unit or units were non-received or partially received, and in the case of one or more partially received data units, which parts (715) of those data units that were not received.

Ex. 4 at 22.  And as amended in the Swedish Patent Office (as of Dec. 2, 2008), the separateness of the two elements is even clearer:

> information which is sent to the sending transceiver is sent as a message (300) comprising:
> Data (ACK) acknowledging properly received data units or frames in the form of a certain sequence number;
> a first extension indicator (E);
> data (NACK) regarding a non-received or partially received data unit or frame, in the form of a certain sequence number;
> a second extension indicator (F), indicating whether the data unit or units were non-received or partially received; and
> in the case of one or more partially received data units, which parts (715) of those data units that were not received,
> wherein said first extension indicator (E) indicates the absence or presence of another set comprising said first (E) and second (F) extension indicators a nd data (NACK) regarding a non-received or partially received data unit or frame in the form of the identifier (SN) of said data unit or frame.

Ex. 5 at 8.  The PCT claims were likewise amended in U.S. prosecution to track the amendment in Sweden, except that the line breaks between the elements composing the message (along with the references to specific objects in the figures) were omitted:

> wherein sending said status information comprises sending a message comprising: data acknowledging properly received data units or frames in the form of a certain sequence number; a first extension indicator; data regarding a non-received or partially received data unit or frame, in the form of a certain sequence number; a second extension indicator, indicating whether the data unit or units were non-received or partially received; and, in the case of one or more partially received data units, which parts of those data units that were not received, and further wherein said first extension indicator indicates the absence or presence of another set comprising said first and second extension indicators and data regarding a non-received or partially received data unit or frame in the form of the identifier of said data unit or frame.

1  Ex. 6 at 2.  In subsequent amendments, Ericsson restored most of the line breaks, but neglected to

2  restore the break in the passage at issue here.

3       Although there is a *formatting* difference between the amended Swedish claims and the

4  amended U.S. claims, it is clear that the claim term in dispute was intended—and would be

5  understood by someone of ordinary skill in the art—to refer to two separate elements.

6       **B.**    **"means for dividing said data units into segments" (claim 13)**

| Ericsson Proposed Construction | Apple Proposed Construction |
|---|---|
| Function:  dividing said data units into segments.<br><br>Corresponding structure:  A control means and a memory as shown in fig. 8 (840, 850); *see* col. 9:62 – 10:6; col. 10:12- 16; *see also* col. 1:33-37; col. 3:42-58; col. 8:35-41. | Function:  dividing said data units into segments.<br><br>Corresponding structure: indefinite. |

11       The parties agree that "means for dividing said data units into segments" should be

12  construed according to 35 U.S.C. § 112(f).  Apple cannot meet its burden to show by clear and

13  convincing evidence that a person of skill in the art would not understand the specification to

14  disclose corresponding structure.  *See Budde*, 250 F.3d at 1376-77.  To the contrary, the

15  specification discloses that the control means (840) and memory (850) shown in Figure 8 perform

16  the claimed function.  *See* '150 patent, col. 10:15-17 ("blocks **840** and **850** may be used for

17  dividing the data units into segments").

18       The specification also explains how the division of the data units into segments is

19  performed.  The process of dividing data units, i.e. PDU's, into segments "is also denoted as re-

20  segmentation." '150 patent, col. 1:36-37.  Later, the specification explains that this division into

21  segments is performed by specifying offsets from the beginning of the PDU:

22            In E-UTRAN RLC, data PDUs can be re-segmented, i.e. the

23            payload of a previously created RLC PDU can, at the time of
          retransmission, be split into segments that are sent separately.

24            In LTE, it is intended that RLC PDU segments should be
          identified by means of the sequence number of the original RLC

25            PDU, as well as a so called segmentation offset, SO, which indicates
          the segments' start in the original RLC PDU.

26  *Id.*, col. 3:42-49.  A person of skill in the art would understand from this description how to carry

27  out the division of data units into segments according to the '150 patent.  For example, if two

28  segments are desired, the PDU is divided by specifying the offset from the beginning of the PDU

to the starting point of the second segment.  Nettleton Decl. ¶¶ 82-84.  The PDU can be divided into more than two segments by specifying additional offsets.  *Id.*

## VII.   **'992 PATENT**

Like the '474 patent, the '992 patent relates to the random access procedure in a cellular network.  Scrambling of communications from mobile devices to the base station is used to randomize interference among multiple devices.  The '992 patent describes a way to scramble messages sent from a mobile device during the random access process.  *See* Vojcic Decl. ¶¶ 27-31.

### A.   **"a user terminal identifier indicating a scrambling sequence from a first set of uplink scrambling sequences that are not specifically assigned to a user terminal" (claims 1, 7)**

| Ericsson Proposed Construction | Apple Proposed Construction |
|---|---|
| Plain meaning. Alternatively, if construction is deemed necessary: "information that identifies a user terminal and is used to determine a scrambling sequence from among a set of uplink scrambling sequences that are not specifically assigned to a user terminal" | "a user terminal identifier indicating a scrambling sequence from a first set of uplink scrambling sequences of a type that are not specifically assigned to a user terminal" |

The lengthy phrase that Apple has designated for construction should simply be construed according to its plain meaning.  Apple appears to agree that the words in the phrase are readily understood because it has simply copied them into its proposed construction and then inserted the words "of a type."  It is unclear what purpose the addition of the words "of a type" to the claim language would serve.  A "type" is simply a category of things that have common characteristics.  Here, it appears tautological that the members of a set of uplink scrambling sequences that are not specifically assigned to a user terminal share the common characteristic of not being specifically assigned to a user terminal, that is, they are of that type.

Alternatively, Apple may be attempting to restrict the claim language to a particular embodiment described in the specification, according to which a "first type" of scrambling sequence is used by the user terminal during the random access procedure and a "second, different type" of scrambling sequence is used thereafter.  *See* '992 patent, col. 5:52 – col. 6:5.  A person of skill in the art would not, however, understand claims 1 and 7 of the patent, which nowhere mention first or second types of scrambling sequences, to be restricted to that embodiment.  *See* Vojcic Decl. ¶¶ 56-57.  This conclusion is reinforced by the fact that other claims of the patent do

expressly claim that embodiment.  In particular, claim 8, which depends from claim 7, provides that "the electronic processing circuitry is configured to select a *second different type* of uplink scrambling sequence."  (Emphasis added.)  *See Phillips*, 415 F.3d at 1315  ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Adding the words "of a type" to otherwise clear language would be pointless at best and could be interpreted as improperly restricting claims 1 and 7 of the patent to an embodiment that the claims were not intended to cover.  To the extent that the phrase at issue is deemed to require construction, Ericsson submits that its proposed alternative construction, which elucidates certain of the terms used in the phrase should be adopted.  *See* Vojcic Decl. ¶ 53.

## VIII.   <u>'710 PATENT</u>

Like the '150 patent, the '710 patent relates to sending status reports (referred to as "error control messages") between a mobile device and a base station.  The patent describes generating such error control messages when resources are available to send them so that the messages will be timely, combined with an "error control timer" to ensure that such messages are not sent too often.  *See* Nettleton Decl. ¶¶ 86-92.

### A.   <u>Order of the Performance of the Elements (claims 1, 8)</u>

| Ericsson Proposed Construction | Apple Proposed Construction |
| --- | --- |
| Elements 2, 3, and 4 must be performed in that order. Elements 5 and 6 must be performed in that order, and must be performed after Elements 2 and 3. Otherwise, the elements need not be performed in any necessary order. <br><br> Elements are: <br><br> (1) signaling a medium access controller that link resources are needed for transmitting data; <br><br> (2) receiving an indication from the medium access controller that link resources for transmitting the data are available; <br><br> (3) responsive to the indication, generating an error control message based on a current error control status; <br><br> (4) forwarding the error control message to the medium access controller for transmissions; <br><br> (5) starting an error control timer; and <br><br> (6) refraining from generating further error control messages until the error control timer expires. | The elements of claims 1 and 8 must be performed in order. Otherwise, the claims are invalid as indefinite. |

Claim 1 lists six steps to be performed by the claimed method.  Claim 8 similarly lists six actions that the claimed apparatus is configured to perform.  At issue is whether all six must be performed in the order listed.  In general, the order in which the steps of a method are listed does not limit the claim unless the claim expressly recites an order.  *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  Because the claims here do not recite an order, they should not be limited unless (1) "as a matter of logic or grammar, they must be performed in the order written," or (2) the specification "directly or implicitly requires such a narrow construction."  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003).  The issue is not the order in which the steps are performed in the embodiments described in the specification.  *Id.* at 1371 (claim not limited to order of steps described in preferred embodiment where no disclaimer of another order).

The parties do not dispute that, as a matter of grammar and logic, the indication that resources are available must be received before an error control message can be generated "responsive to the indication," and that the message must be generated before it can be forwarded.  Thus, steps 2, 3, and 4 must occur in that order.  Similarly, an error control timer must be started before it can expire, so steps 5 and 6 must occur in that order.  And because step 6 requires "refraining from generating *further* error control messages until the error control timer expires," it must come after step 3, in which the prior error control message is generated.  Thus, steps 2, 3, 5, and 6 must occur in that order.  But nothing in grammar, logic, or the specification requires that step 1 be performed before step 2, or that step 4 be performed before step 5.

Step 1 involves telling the medium access controller ("MAC") that resources are needed to transmit data, and step 2 involves being told by the MAC that resources are available.  One way to implement this method is for the device to be proactive, first telling the MAC that resources are needed and then waiting to hear back from the MAC that resources are available.  Another logical implementation, however, is for the device to be passive and the MAC to be proactive:  the MAC reaches out to the device when resources are available, and if the device needs those resources, it reserves them in a response back to the MAC.  *See* Nettleton Decl. ¶¶ 98-100.

Similarly, there is no logical or inherent reason why the error control message must be

delivered to the MAC for transmission (step 4) before the error control timer is started (step 5). The claims describe a timer that prohibits the further *generation* of error control messages for a period, to prevent messages from being generated too quickly in succession.  Once a message is generated, there is no reason that the timer could not be started at the same time, or just before, the message is sent to the MAC for transmission.  *See* Nettleton Decl. ¶¶ 101-102.  Indeed, the specification discloses that "the receiving node typically starts the status-prohibit timer [a type of error control timer] *at the moment* the status report is transferred from the RLC layer to the MAC layer." '710 patent, col. 2:21-24 (emphasis added).

**B.**   **"radio link controller is configured to: signal the medium access controller that link resources are needed for transmitting data; receive an indication from the medium access controller that link resources for transmitting the data are available; responsive to the indication, generate an error control message based on a current error control status; forward the error control message to the medium access controller for transmission via the radio transceiver; start an error control timer; and refrain from generating further error control messages until the error control timer expires" (claim 8)**

| Ericsson Proposed Construction | Apple Proposed Construction |
| --- | --- |
| Plain meaning.  Alternatively, if deemed to be governed by 35 U.S.C. § 112(f): | Should be construed pursuant to 35 U.S.C. § 112(f). |
| Function:  The functions that the radio controller is configured to perform, as stated in the disputed term. | Function: The functions that the radio controller is configured to perform, as stated in the disputed term. |
| Corresponding alternative structures:  A radio link controller as shown in fig. 8 (830) and/or a radio link control layer as shown in fig. 2 ("RLC") and/or the programmable processors, hardware circuits, and/or software implementing them. *See* col. 3:59-4:8; col. 9:10-29; col. 9:39-10:2; *see also* Figs. 5, 6, 7; col. 1:22-2:31; col. 4:32-5:7; col. 7:1-9:9. | Corresponding structure: the algorithm disclosed in Fig. 7. |

A person of skill in the art would understand that a "radio link controller" refers to definite structure, namely, as the '710 patent explains, "any of a variety of combinations of analog and digital hardware and programmable processors configured with software" that implement the radio link control (RLC) layer protocol.  '710 patent, col. 9:39-54.  For example, the patent goes on to explain, the radio link (RLC) controller "may be implemented with a microprocessor programmed with software defining an RLC layer." *Id.*, col. 9:55-57.

1    The "RLC layer" implemented by the claimed radio link controller refers to a protocol that,

2    as the specification explains, "performs various functions including the establishment, release, and

3    maintenance of an RLC connection, segmentation and reassembly of variable length, higher layer

4    PDUs into or from smaller RLC PDUs, concatenation, error correct by retransmission (ARQ), in

5    sequence delivery of higher layer PDUs, duplicate detection, flow control, and other functions."

6    '710 patent, col. 4:32-38.  The RLC layer also communicates with the medium access control

7    (MAC) layer.  *See id.*, figs. 2, 8.  A person of skill in the art would thus understand that a radio

8    link controller is a structure responsible for handling precisely the sort of functions set forth in the

9    disputed phrase, namely communicating with the MAC layer and carrying out a number of

10   functions relating to error control.  Nettleton Decl. ¶¶ 104-108.   Because the claim discloses

11   adequate structure, namely a radio link controller, to perform the functions set forth in the claim, it

12   is not subject to § 112(f).  *See Williamson*, 792 F.3d at 1348-49.

13   Alternatively, if the term "radio link controller" is deemed to not disclose a sufficiently

14   definite structure by itself, then, pursuant to § 112(f), the term should be construed to cover the

15   alternative structures for such a controller disclosed in the specification, as discussed above, and

16   equivalents thereof.  This is not a case where the specification discloses nothing more than a

17   "general purpose computer" for performing a function.  Rather, the specification discloses a

18   specific sort of controller—a radio link controller—that corresponds to the functions described in

19   the claim and denotes a definite structure to a person of skill in the art.  *See AllVoice Computing*

20   *PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1242 (Fed. Cir. 2007) (concluding that reference

21   to well-known DDE protocol used in a computer to exchange data between applications "is a

22   structure corresponding to the 'output means' clause").

23   Apple's identification of the flow chart of figure 7 as the purported "structure"

24   corresponding to the radio link controller of claim 8 cannot be correct for yet another reason.

25   Figure 7, designated in the specification as an "exemplary method," '710 patent, col. 8:44,

26   includes a step that does not appear in claim 8—"receive notification that transmission started (or

27   completed)"—in response to which the error control timer is activated.  *Id.*, col. 9:5-10.  But the

28   specification makes clear that no such notification is necessary; to the contrary, the error control

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

1   timer could simply be activated "at the moment the status report is transferred from the RLC layer

2   to the MAC layer," without any notification step.  *Id.*, col. 2:21-24; Nettleton Decl. ¶ 110.

3        Finally, even if Apple were correct that the flow chart of figure 7 was the corresponding

4   structure described in the specification, Apple's proposed construction would still be overly

5   narrow.  Apple apparently seeks to restrict the claim language to the particular steps shown in

6   Figure 7, but ignores that the claim term must be construed to cover the structure disclosed in the

7   specification *and equivalents thereof.*  The steps in the flowchart of Figure 7 could be modified in

8   various ways and still perform the claimed functions "in substantially the same way to achieve

9   substantially the same result."  *See IMS Tech.*, 206 F.3d at 1435.

10       **C.      "further error control messages" (claims 1, 8)**

11

| Ericsson Proposed Construction | Apple Proposed Construction |
|---|---|
| "error control messages subsequent to the one generated in response to the indication that link resources are available" | No construction necessary, plain and ordinary meaning |

12

13       The last-recited step of method claim 1 is "refraining from generating *further* error control

14  messages until the error control timer expires" (emphasis added).  (Apparatus claim 8 includes a

15  similar limitation.)  The only error control message described in claim 1 as having *already* been

16  generated is the one in the third step:  "responsive to the indication, generating an error control

17  message based on a current error control status."  The antecedent basis for "the indication" in this

18  third step is found in step two:  "receiving an indication from the medium access controller that

19  link resources for transmitting the data are available."  Thus, one of ordinary skill in the art would

20  understand that when the last step refers to "further error control messages," that means messages

21  subsequent to the one generated in response to the indication that resources are available, as

22  described in steps 2 and 3.  *See* Nettleton Decl. ¶¶ 112-114.

23  **IX.     CONCLUSION**

24       For the reasons set forth above, the Court should adopt Ericsson's proposed constructions

25  of the terms in dispute.

26

27

28

1  DATED:  October 12, 2015                MUNGER, TOLLES & OLSON LLP
2                                                  GREGORY P. STONE
                                                   STEVEN M. PERRY
3                                                  BENJAMIN J. HORWICH
                                                   ZACHARY M. BRIERS
4
                                          MCKOOL SMITH HENNIGAN, P.C.
5                                                  MIKE MCKOOL, JR. (*pro hac vice*)
                                                   DOUGLAS A. CAWLEY (*pro hac vice*)
6                                                  COURTLAND L. REICHMAN
7
8                                         By:        */s/ Gregory P. Stone*
                                                   Gregory P. Stone
9                                         Attorneys for Defendants ERICSSON INC. and
                                          TELEFONAKTIEBOLAGET LM ERICSSON
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF