GREGORY STONE (Bar No. 78329)
gregory.stone@mto.com
STEVEN PERRY (Bar No. 106154)
steven.perry@mto.com
BENJAMIN HORWICH (Bar No. 249090)
ben.horwich@mto.com
ZACHARY BRIERS (Bar No. 287984)
zachary.briers@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

COURTLAND REICHMAN (Bar No. 268873)
creichman@mckoolsmithhennigan.com
MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, California 94065
Telephone:    (650) 394-1400
Facsimile:    (650) 394-1422

MIKE MCKOOL, JR. (*pro hac vice*)
mmckool@mckoolsmith.com
DOUGLAS CAWLEY (*pro hac vice*)
dcawley@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:     (214) 978-1000
Facsimile:     (214) 978-4044

*Attorneys for Ericsson Inc. and
Telefonaktiebolaget LM Ericsson*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC.,<br><br>           Plaintiff-Counterdefendant,<br><br>vs.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, and ERICSSON, INC.,<br><br>           Defendants-Counterclaimants. | Case No. 3:15-cv-00154 JD<br><br>**DECLARATION OF DR. VIJAY K. MADISETTI IN SUPPORT OF DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Judge:   Hon. James Donato<br>Date:    December 11, 2015<br>Time:   11:00 a.m.<br>Ctrm:    11 |

I, Vijay K. Madisetti, declare as follows:

## I. BACKGROUND

1. I am a full Professor of Electrical & Computer Engineering at the Georgia Institute of Technology in Atlanta, Georgia. My *Curriculum Vitae* is attached as Exhibit A to this declaration.

2. I have been retained in this case by counsel for defendants Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively referred to as "Ericsson"). In this declaration, I provide my opinions regarding the interpretation of certain terms as used in the asserted claims of U.S. Patent No. 7,660,417 ("the '417 patent"). I give my opinion as to the meaning that would have been given to these terms and phrases by one of ordinary skill in the art at the time of the invention, *i.e.*, as of the effective filing date of the patent application.

3. In rendering my opinions below, I have reviewed each of the Asserted Patents and their respective prosecution histories. I have also considered various other sources of information, such as technical and non-technical dictionaries, patents, and publications that were available to persons of ordinary skill in the art as of the effective filing dates of the Asserted Patents, including any citations identified in this declaration. My opinions are further based upon my education, training, research, knowledge, and professional experience in the relevant art.

4. I reserve the right to supplement and/or amend my opinions in this declaration based on future positions taken by Apple or its experts, additional documents, testimony or other information provided by Apple or its witnesses, any orders from the Court, or as otherwise necessary.

## II. QUALIFICATIONS

5. A detailed record of my professional qualifications, including a list of publications, awards, professional activities, and recent testimony either at trial or at deposition, is attached as Exhibit A to this declaration and summarized below.

6. I am a Professor of Electrical/Computer Engineering at the Georgia Institute of Technology. I lead several research and educational programs at Georgia Tech in the area of

1  digital signal processing, embedded computing systems, chip design, wireless and telecom
2  systems, and systems engineering.

3  7. I am an IEEE Fellow. I was awarded the 2006 Frederick Emmons Terman Medal
4  by the American Society of Engineering Education (ASEE) and Hewlett-Packard Corporation for
5  my contributions to electrical engineering.

6  8. I have authored or co-authored several books and have been an active consultant to
7  industry and various research laboratories (including MIT Lincoln Labs and Johns Hopkins
8  University Applied Physics Laboratory). I have founded three companies in the areas of
9  embedded software, military chipsets, and wireless communications.

10  9. I have taught classes at Georgia Tech and performed research in the Electrical and
11  Computer Engineering (ECE) Department, including in the areas of embedded software systems,
12  wireless & networking, digital signal processing, speech, audio, video, and image processing,
13  digital signal processing hardware and software, and advanced computing environments. I have
14  also supervised the dissertations of over twenty Ph.D. students, and been recognized as an
15  Outstanding Ph.D. Dissertation Advisor.

16  10. I have been active in the area of computer and information security and protection
17  in the networked environment since the late 1980s, starting with my work on "GAFFES: A
18  Design of A Globally Distributed File System" (EECS Technical Report, UCB/CSD-87-361, June
19  1987), which described early work on security, authentication and replication in the network
20  context. I have also published papers in the area of coding theory for secure storage,
21  communications and noise immunity in the context of storage networks (*see* "Constrained
22  Multitrack RLL Codes for the Storage Channel," IEEE Transactions on Magnetics, Vol 31, Issue
23  3, 1995, for instance). I have also developed algorithms for detection of erroneous (or false)
24  information that can be introduced and propagated into computer networks, and developed a
25  preemptive algorithm called WOLF that has been efficient in limiting the propagation by rolling
26  back the effects of incorrect messages within a network. (*See* WOLF: A Rollback Algorithm for
27  Optimistic Distributed Simulation Systems, 1988).
28

11. More recently, I have co-authored two books: "Cloud Computing: A Hands-On Approach" (2013) and "Internet of Things: A Hands-On Approach" (2014), that discuss recent developments in security for cloud-based networks and networked systems, and these books are already being used as prescribed textbooks by several universities around the world.

12. I have co-authored an invited paper in the Proceedings of the IEEE, the flagship publication of the IEEE, entitled "Next Generation Applications on Cellular Networks: Trends, Challenges and Solutions" (2012), in collaboration with engineers from Ericsson, that describes and surveys recent developments in security and authorization in the context of cellular networks.

13. I have been a consultant to the industry since the 2004 timeframe in the areas of Security Certification & Accreditation (C&A) of Computer Systems & Networks, in prescribing and evaluating compliance with Information Security Standards prescribed by the U.S. National Institute of Standards & Technology (NIST), specifically NIST 800-30/37, and also in the area of billing fraud and security threats in cellular communications networks.

14. I have also developed software for several commercial mobile and cellular devices in the areas of coding, compression and encryption in the 2000-2008 timeframe, and have been involved in testing compliance with 3GPP standards over several projects in the past two decades.

15. I hold a Bachelor of Technology (Honors) in Electrical & Electronic Communications Engineering from the Indian Institute of Technology (IIT), and a Ph.D. in Electrical Engineering and Computer Sciences (EECS) from the University of California at Berkeley. I have published extensively, including about 100 technical publications and eight books in the area of computing, signal processing and communications systems. Several of these publications relate directly to the design of efficient protocols and codes for information protection and storage, information security in wireless networks, and secure and efficient software for distributed networked systems.

16. I have also been qualified as an expert and testified in several legal matters in the areas of communications, computers, networking, and software, and many of these matters have included security-related technologies.

## III. LEGAL STANDARDS

17. I understand that the parties have agreed that the term at issue from the '417 patent is a means-plus-function term. I further understand that such a claim term is to be construed to cover the corresponding structure described in the specification and equivalents thereof. I further understand that corresponding structure is structure disclosed in the specification that performs the function stated in the means-plus-function term and that is sufficiently definite to render the bounds of the claim understandable to a person of ordinary skill in the art. The corresponding structure need not be a single structure so long as the class of structures is identifiable by a person of ordinary skill in the art.

18. I further understand that a structure is considered equivalent to one set forth in the specification for purposes of construing a means-plus-function term if it performs the function at issue in substantially the same way to achieve substantially the same result.

## IV. PERSON OF ORDINARY SKILL IN THE ART

19. Based on my review of the '417 patent and related documents, and further based on my experience teaching and performing research in the wireless communications field, including in security for wireless communications, as well as my experience collaborating and consulting with concerns in that industry, it is my opinion that a person of ordinary skill in the art would have a Master of Science degree in electrical engineering, or the equivalent thereof, and 1-2 years of practical experience in security for wireless communications. More experience designing and implementing security for wireless communications systems could also qualify one not having the aforementioned education as a person of ordinary skill in the art. Conversely, additional education, such as a more advanced degree, could qualify one having somewhat less experience than indicated above.

20. As of the alleged priority date of the '417 patent, September 26, 2003, I was at least a person of ordinary skill in the art.

## V. OVERVIEW OF THE '417 PATENT

21. The '417 patent is titled "Enhanced Security Design for Cryptography in Mobile Communication Systems" and claims priority to a provisional application that was filed on

-4-  Case No. 3:15-cv-00154 JD

MADISETTI DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

1  September 26, 2003.  The patent issued on February 9, 2010, to inventors Rolf Blom, Mats

2  Näslund, and Jari Arkko. The patent was assigned to Ericsson.

3      22.    The '417 patent relates to security for wireless networks and, more specifically, to
4  the selection of security keys to be used with security algorithms.  Since messages sent between a
5  mobile device and the network travel through the air, the potential exists that the messages could
6  be intercepted and read or changed by someone other than the intended recipient.  Security
7  algorithms are thus used for two purposes:  confidentiality and integrity.  Messages sent between
8  the mobile device and the network are encrypted using an agreed security algorithm in such a way
9  that nobody other than the intended recipient can decrypt and read the messages.

10      23.    Security algorithms can also be used to check the integrity of a message, i.e. that
11  the message has not been altered after transmission.  In this case, an algorithm is used to generate
12  a "message authentication code" (MAC) that is sent along with the message.  If the recipient
13  generates the same MAC, it has verified that the message has not been tampered with.

14      24.    Security algorithms require as input a secret "security key," known to both the
15  sender and recipient.  In cellular communications, the mobile device and network generally agree
16  on security algorithms to use and agree on security keys during an "authentication and key
17  agreement" (AKA) procedure when the mobile device first connects to the network.

18      25.    The background section of the '417 patent describes a security problem that arose
19  in GSM after a way of breaking one of its security algorithm choices had been discovered.  In
20  GSM, the same cryptographic key was used regardless which of the potential security algorithms
21  was selected for protected communications. The patent explains that the use of such a common
22  key could result in a weakness in one algorithm compromising the security of other algorithms.

23      26.    The patent describes an improved security system that involves generating
24  cryptographic keys that are algorithm-specific.  In one embodiment described in the specification,
25  the mobile device generates a basic security key during an authentication and key agreement
26  ("AKA") procedure with the network.  The device and network agree on a security algorithm to
27  use, and the basic key and information about the selected algorithm are fed into a "key modifying
28  function" that generates the algorithm-specific security key based on those inputs.

-5-  Case No. 3:15-cv-00154 JD
MADISETTI DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

## VI. CLAIM CONSTRUCTION

27. I understand that Ericsson is asserting claims 19, 21, 24, and 25 of the '417 patent against certain Apple's products.

28. I understand that the parties dispute the construction of the term "means for generating an algorithm-specific security key" which appears in independent claim 19 from which claim 21 depends. While the parties agree that the term is a so-called "means-plus-function" term, they disagree on the corresponding structure in the patent specification.

29. The parties' proposed constructions of this term are set forth below:

| "means for generating an algorithm-specific security key" ||
| --- | --- |
| **Ericsson's Proposed Construction** | **Apple's Proposed Construction** |
| Function: Generating an algorithm-specific security key<br><br>Corresponding alternative structures: A module, including one or more processors, for generating an algorithm-specific security key as shown in fig. 1 (modify, 22), fig. 4 (modify, 22), fig. 5 (security enabling nodes) and fig. 6 (BSS); *see also* fig. 2 (step S3); fig. 3 (steps 6, 8); fig. 7 (steps 10, 12); col. 2:23-27; col. 2:50-55; col. 4:45-67; col. 5:42-44; col. 5:51 – col. 6:23; col. 6:62 – col. 7:4; col. 7:48- 51; col. 8:32-63; col. 9:5-9; col. 9:15-29; col. 10:19-23; col. 10:29-40; col. 10:53-57; col. 10:64-67; col 11:15-21; col. 11:40-62; col. 13:17-24. | Function: Modifying a basic security key to obtain an algorithm-specific security key<br><br>Corresponding structure: Hardware or software programmed to use MD5 or SHA1 (with or without HMAC) with the basic security key and the identifier of the enhanced security algorithm as required inputs, and RAND and RES as optional inputs. |

30. The '417 specification discloses that the algorithm-specific security key of claim 19 is generated by one of the modules listed in Ericsson's proposed construction. That is, the algorithm-specific security key is generated in the mobile terminal by the "modify" module shown in figures 1 and 4. Since the same key must also be generated on the network side to enable communications with the mobile terminal, the specification discloses that the "security enabling nodes" shown in figure 5 (corresponding, in the case of GSM, to the BSS (Base Station System) shown in figure 6), also generate the algorithm-specific security key. A person of ordinary skill in

the art would understand that these modules execute the "cryptographic modify function" specified in the specification (*see* '417 patent, col. 4:59) which takes as inputs the "basic security key" and information regarding the selected security algorithm and generates the algorithm-specific security key.

31.     The specification further discloses classes of functions from which the cryptographic modify function may be chosen. These include "one-way function[s]," "pseudo-random function[s]," and "cryptographic hash functions."  '417 patent, col. 4:58-62.  Each of these classes of functions is well-understood by persons of ordinary skill in the art.

32.     A "one-way function" is a function that is easy to compute for any inputs, but difficult to invert – that is, given the output of the function, it is difficult to recover the input. "Easy" and "difficult" are understood in terms of computational complexity. That is, one way functions are straightforward for a computer to calculate for any inputs, but would require an impractical amount of computer time to invert. *See*, *e.g.*, Ex. B (Forsberg, et al, "LTE Security," (2010), at 14 (a text whose authors include members of the 3GPP Working Group on Security)).

33.     A "pseudo-random function" is a one-way function that is difficult to distinguish from a true random function, that is a function whose outputs are entirely random. "Difficult," again, is to be understood in terms of computational complexity.

34.     A "cryptographic hash function" is a pseudo-random function that is also a "hash function"; that is, for any input, it returns a string of fixed length. *See*, *e.g.*, Ex. B (Forsberg, et al, "LTE Security," (2010), at 17-18). There are various well known examples of hash functions that have been widely used in cryptography. These include the examples mentioned in the specification, SHA1 and MD5 ('417 patent, col. 8:45-47), as well as more recently-developed members of the SHA family of functions, including SHA-2 and SHA-3, and various versions of a cryptographic hash function known as RIPEMD.

35.     Apple's proposed construction seeks to limit the structure corresponding to the claimed "means for generating an algorithm-specific security key" to the specific two examples of cryptographic hash functions mentioned in the '417 patent specification. However, a person of ordinary skill in the art would not understand the corresponding structure to be so limited. Indeed,

the specification says only that the given examples, MD5 and SHA1 "can be used." '417 patent, col. 8:46-47.

36. The specification makes clear that the required cryptographic modify function "at least should be a one-way function and preferably a pseudo-random function" and that, as an example, it "may be implemented as a cryptographic hash function." '417 patent, col. 4:58-62. A person of skill in the art would understand from this disclosure that the structure corresponding to the "means for generating an algorithm-specific security key" includes the class of functions known as one-way functions, as well as the subclasses of pseudo-random functions and cryptographic hash functions. Since these classes of functions are well-understood by persons of skill in the art, this disclosure along with the "modify" module used to implement the modify function convey definite structure to a person of skill in the art.

37. A person of ordinary skill in the art would certainly not consider the structure corresponding to the "means for generating an algorithm-specific security key" to be limited to the specific examples of cryptographic hash functions given in the specification. First, such a person would understand from the disclosure of broader classes of potential functions that any members of those classes could be used, the important characteristic being that the basic security key should not be readily recoverable from the modified algorithm-specific security key. Second, a person of skill in the art would understand that it would make little sense to limit the claims to specific examples of hash functions in use at the time of the patent application. Rather, such a person would understand that cryptographic algorithms evolve over time and that the inventors could not have intended to restrict their patent to particular algorithms that would inevitably be superseded. Indeed, both MD5 and SHA1 are no longer in wide use because they have been compromised to some extent since the priority date of the '417 patent. *See*, *e.g.*, Ex. B (Forsberg, et al, "LTE Security," (2010), at 18) (noting, as of 2010, the perceived weaknesses of MD5 and SHA-1, and stating that "[a]t the time of writing, the most popular hash function is SHA-256," a version of SHA-2).

38. Even if one were to consider MD5 and SHA1 as the structures corresponding to the generation of algorithm-specific security keys, Apple's proposed construction would still be too

1  narrow because if fails to take into account equivalent structures.  As I noted above, it is my
2  understanding that a structure is considered equivalent to one set forth in the specification for
3  purposes of construing a means-plus-function term if it performs the function at issue in
4  substantially the same way to achieve substantially the same result

5       39.     Here numerous other functions would be considered equivalent to MD5 and SHA1
6  in this sense.  Certainly, the use of any cryptographic hash function could be used to generate
7  algorithm-specific security keys and would do so in substantially the same way, namely by
8  manipulating the basic security key and information about the selected security algorithm to obtain
9  a fixed length string corresponding to the algorithm-specific security key.  In addition, it would
10 achieve substantially the same result as MD5 or SHA1, namely an algorithm-specific security key
11 that could not readily be used to recover the basic security key.  Other functions may also be
12 equivalent to MD5 or SHA1 for these purposes and would have to be evaluated on a case-by-case
13 basis.

14      I declare under the penalty of perjury of the laws of the United States of America that the
15 foregoing is true and correct and that this declaration was executed on October 10, 2015, in
16 Atlanta, Georgia.

_____
Vijay K. Madisetti
10/10/15