GREGORY STONE (Bar No. 78329)
gregory.stone@mto.com
STEVEN PERRY (Bar No. 106154)
steven.perry@mto.com
BENJAMIN HORWICH (Bar No. 249090)
ben.horwich@mto.com
ZACHARY BRIERS (Bar No. 287984)
zachary.briers@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

COURTLAND REICHMAN (Bar No. 268873)
creichman@mckoolsmithhennigan.com
MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, California 94065
Telephone:      (650) 394-1400
Facsimile:      (650) 394-1422

MIKE MCKOOL, JR. (*pro hac vice*)
mmckool@mckoolsmith.com
DOUGLAS CAWLEY (*pro hac vice*)
dcawley@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:      (214) 978-1000
Facsimile:      (214) 978-4044

*Attorneys for Ericsson Inc. and*
*Telefonaktiebolaget LM Ericsson*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC.,<br><br>                    Plaintiff-Counterdefendant,<br><br>          vs.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, and ERICSSON, INC.,<br><br>                    Defendants-Counterclaimants. | Case No. 3:15-cv-00154 JD<br><br>**DECLARATION OF DR. BRANIMIR VOJCIC IN SUPPORT OF DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Judge:    Hon. James Donato<br>Date:     December 11, 2015<br>Time:     11:00 a.m.<br>Ctrm:     11 |

I, Branimir Vojcic, declare as follows:

**I.      BACKGROUND**

1.      I am a Professor Emeritus in the Electrical & Computer Engineering Department at the George Washington University. My *Curriculum Vitae* is attached as Exhibit A to this declaration.

2.      I have been retained in this case by counsel for defendants Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively referred to as "Ericsson").  In this declaration, I provide my opinions regarding the interpretation of certain terms as used in the asserted claims of U.S. Patent Nos. 6,895,474 and 8,169,992 (collectively, the "Asserted Patents").  I give my opinion as to the meaning that would have been given to these terms and phrases by one of ordinary skill in the art at the time of the invention, *i.e.*, as of the effective filing date of the patent application.

3.      In rendering my opinions below, I have reviewed each of the Asserted Patents and their respective prosecution histories.  I have also considered various other sources of information, such as technical and non-technical dictionaries, patents, and publications that were available to persons of ordinary skill in the art as of the effective filing dates of the Asserted Patents, including any citations identified in this declaration.  My opinions are further based upon my education, training, research, knowledge, and professional experience in the relevant art.

4.      I reserve the right to supplement and/or amend my opinions in this declaration based on future positions taken by Apple or its experts, additional documents, testimony or other information provided by Apple or its witnesses, any orders from the Court, or as otherwise necessary.

**II.      QUALIFICATIONS**

5.      I have been involved in research and development relating to wireless communications for over 30 years.  A detailed record of my professional qualifications, including a list of publications, awards, professional activities, and recent testimony either at trial or at deposition, is attached as Exhibit A to this declaration and summarized below.

VOJCIC DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

6.      I received Diploma of Engineering, Master of Science, and Doctor of Science degrees in Electrical Engineering from the University of Belgrade in Yugoslavia in 1981, 1986, and 1989, respectively.  The primary focus of my Doctor of Science studies was on Code Division Multiple Access (CDMA) and spread spectrum communications technologies.

7.      From 1981 through 1991, I worked for the Ministry of Defense in Yugoslavia in the area of wireless communications.

8.      In 1991, I joined The George Washington University as an Assistant Professor in the Electrical & Computer Engineering Department, and was promoted to Associate Professor and Professor in 1997 and 2000, respectively.  From 2001 to 2004, I served as the Chairman of the department.  I retired earlier this year and am currently a Professor Emeritus.

9.      During my tenure at The George Washington University, I taught a dozen different courses on communications theory and networks, wireless communications, and CDMA, and I was a course director for a number of courses in communications.  I supervised students primarily in the areas of wireless communications and CDMA, OFDM, MIMO, advanced coding techniques, cellular, satellite and Wi-Fi systems and was the thesis director for a number of Doctor of Science candidates, who now have successful careers in academia, industry, and government.

10.     I have also conducted research in many areas of wireless communications such as CDMA, MIMO, OFDM, capacity achieving codes, etc., which are applicable to modern cellular and wireless LAN systems.  My research has been supported by the communications industry and various government agencies, such as the Advanced Research Project Agency (ARPA), the National Science Foundation (NSF), and the National Security Agency (NSA).  Much of this research concerns communications theory, performance evaluation, modeling wireless networks, multi-user detection, adaptive antenna arrays, and ad-hoc networks.

11.     I have authored and coauthored a number of journal and conference papers, contributed to various books, and coauthored a text book on CDMA, entitled The cdma2000 System for Mobile Communications, Prentice Hall, 2004.  I have also served as a coeditor of a book on wireless communications, entitled Multiaccess, Mobility and Teletraffic in Wireless

VOJCIC DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

Communications, Volume III, Kluwer Academic Publishers, 1998.  A detailed listing of my publications is included in Exhibit A.

12.     I am a named inventor on two U.S. Patents related to wireless communications, and have four other patent applications pending.

13.     In 1995, I received the National Science Foundation Faculty Early Career Development (CAREER) Award. The award is given annually by NSF to a select group of young professors nationwide to promote excellence in teaching and research.

14.     I have served as a consultant for numerous companies in the wireless communications industry in the areas of 2G/3G/4G and mobile technologies, wireless LANs, new generation broadcast systems, advanced mobile satellite systems and other aspects of modern communication systems.  I have also taught short courses for the industry and government on various aspects of communications in the areas of 2.5G and 3G cellular standards, such as CDMA2000 1xRTT, CDMA2000 Evolution Data Optimized (EVDO), and Wideband Code Division Multiple Access (WCDMA).

15.     I am a Senior Member of the IEEE and was an Associate Editor for the IEEE Communications Letters and the Journal on Communications and Networks.  I served as a member of technical program committees, as a session organizer for many technical conferences and workshops, and as a reviewer of technical papers for many journals and conferences.

16.     I have served as an expert witness and technical consultant in numerous litigation matters concerning wireless communications. This work has been performed on behalf of entities such as Interdigital Communications, Realtek, and HTC.  I have testified in several trials and arbitrations as an expert witness.  A complete listing of all cases in which I have testified is included in Exhibit A.

### III.    LEGAL STANDARDS

17.     I understand that claim terms are to be interpreted from the point of view of a person of ordinary skill in the art at the time the application leading to the patent was filed.  I further understand that claim terms are generally to be given their ordinary meaning, considered in light of the claim language, patent specification, and prosecution history.  However, if the patentee

has acted as his or her own lexicographer and clearly set forth a definition of a claim term different from its ordinary meaning, then the claim term will be given this special definition. I have applied these principles in reaching my opinions as to the correct construction of the disputed claim terms set forth below.

## IV.   PERSON OF ORDINARY SKILL IN THE ART

18.   Based on my review of the Asserted Patents and related documents, and further based on my experience teaching and performing research in the wireless communications field, as well as my experience collaborating and consulting with concerns in that industry throughout the 1990s and 2000s, it is my opinion that a person of ordinary skill in the art would have a Master of Science degree in electrical engineering, or the equivalent thereof, and 1-2 years of practical experience in wireless communications. More experience designing and implementing wireless communications systems could also qualify one not having the aforementioned education as a person of ordinary skill in the art.

19.   As of the earliest alleged priority date of the Asserted Patents, October 5, 1998, I was at least a person of ordinary skill in the art.

## V.   OVERVIEW OF THE ASSERTED PATENTS

### A.   Technology Background

20.   The Asserted Patents both relate to wireless communications in a cellular network. A cellular network is divided into a number of small cells, or geographical coverage areas, as shown in the figure below. Within each cell there is a "base station" (designated as "BS" in the figure) which typically consists of an antenna tower and transmitting and receiving equipment, which provides radio coverage, i.e., connectivity to a number of mobile devices (designated as "MS," standing for "mobile station," in the figure). The base stations are further connected to the infrastructure network that provides the interface to the public switched telephone network and the internet.



21.     The Asserted Patents both concern aspects of the random access procedure in such a cellular network.  The random access procedure is typically used when a mobile device seeks to connect to the network.  It is called *random* access, because, unlike transmissions from the mobile device on an assigned or scheduled channel resource, the mobile device may choose to initiate the procedure at any time by sending all or part of a random access request, that is, a connection request, to the network.  At least the initial part of the random access request is transmitted on a common channel resource that may be used simultaneously and independently by other mobile devices and as a consequence collisions between transmissions from different devices may occur.

**B.     The '474 Patent**

22.     U.S. Patent No. 6,985,474 (hereafter "the '474 patent") is titled "Random Access in a Mobile Telecommunications System." The '474 patent claims priority to an application that was filed on October 5, 1998.  The patent issued on January 10, 2006, to inventors Erik Dahlman, Per Beming, and Maria Gustafsson. The patent was assigned to Ericsson.

23.     When it first seeks to connect to the base station, the mobile device does not know the transmit power level to use.  If it uses too little power, the transmission will not be received by the base station.  Too much power, on the other hand, is inefficient and could also result in unnecessary interference with other mobile devices.

24.     The '474 patent describes, among other things, an embodiment in which the random access request from a mobile device is separated into a preamble and a message part

VOJCIC DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

containing information regarding the desired connection. *See, e.g.,* '474 patent, col. 6:3-19 & Fig. 7,  The short preamble is sent beginning at a low power level and then at successively increasing power levels – a process known as "power ramping" – until the preamble is detected by the base station. *See, e.g.*, *id.*, col. 4:21-26, col. 6:3-19, & Fig. 7.  When it detects the random access request, before it has decoded the request, the base station responds with an "acquisition indicator."  *See, e.g.*, *id.*, col. 4:12-15.  In one embodiment the presence of the random access transmission is indicated by detection of the preamble, based on the amount of energy detected. *See, e.g.*, *id*,  col. 4:7-15, col. 5:15-24.  In some embodiments the preamble detection is facilitated by comparing the output of a matched filter (tuned to the preamble) to a threshold in a threshold detection unit. *See*, *e.g.*, *id.*, col. 5:40-61. After the mobile device receives the acquisition indicator it can then transmit the message part of the random access request at the appropriate power level, such that the message part could be correctly decoded at the base station. *See, e.g.*, *id.*, col. 3:7-12.

25.     The '474 patent explains that this method results in less delay than power ramping the entire random access request, including the message part, until the base station acknowledges that it has correctly decoded it.  *See*, *e.g.*, '474 patent, col. 4:16-21, col. 5:25-30.

26.      The '474 patent also describes having the mobile device transmit a preamble that is dependent on randomly selected signature pattern.  The use of such a randomly selected signature pattern allows the base station to distinguish random access requests from different mobile devices. *See, e.g.*, the '474 patent, col. 5:47-50, col. 6:43-46.

**C.     The '992 Patent**

27.     U.S. Patent No. 8,169,992 (hereafter "the '992 patent") is titled "Uplink Scrambling during Random Access." The application for the '992 patent was filed on August 8, 2007, and the patent issued on May 1, 2012, to inventors Stefan Parkvall, Erik Dahlman, and Tobias Tynderfeldt. The patent was assigned to Ericsson.

28.     The '992 patent explains that, in LTE networks, uplink transmissions – that is transmissions from a mobile device to the base station – are scrambled.  Scrambling entails multiplying the bits in the transmitted message by a "scrambling sequence" that, as the name implies, mixes up the bits of the transmission.  So long as different mobile devices use different

scrambling sequences, the bit patterns of their transmissions are mixed up in different ways and interference among devices is randomized.  *See, e.g.*, '992 patent, col. 3:17-22.

29.     Of course, the base station must know the scrambling sequences being used by the mobile devices in order to descramble the messages.  The '992 patent further explains that during the random access procedure "uplink transmissions from the user terminal cannot employ terminal-specific scrambling sequences or reference numbers to randomize interference because the initial random access request message from the user terminal has just started communicating with the network and neither a terminal-specific scrambling code nor a terminal-specific reference number has [] been assigned to that user terminal."  '992 patent, col. 3:6-13.

30.     The invention of the '992 patent enables scrambling of uplink transmissions during the random access procedure.   In one embodiment described in the patent, after the mobile device sends a random access preamble to the base station, the base station responds with a message that includes, among other things, a "user identifier" that indicates a scrambling sequence to use for scrambling message 3 (and, potentially, subsequent uplink transmissions). *See, e.g.*, '992 patent, col. 10:31:38.  (The message part of the random access request is referred to as "message 3" because it follows the preamble in Step 1 and the random access response message in Step 2 during the random access procedure. *See, e.g., id.*, Fig. 7 & col. 7:38-56, col. 8:13-65.)

31.     In certain other embodiments described in the specification, two different types of scrambling sequences may be used.  The first type is used for scrambling message 3.  The user terminal then receives from the base station a different type of scrambling sequence that is used to scramble subsequent messages.  *See, e.g.,* '992 patent col. 5:52-6:6.

## VI.     CLAIM CONSTRUCTION

### A.     The '474 Patent

32.     I understand that Ericsson is asserting claims 53, 56, and 57 of the '474 patent against certain Apple products.

33.     I understand that the parties dispute the meaning of the clause "prior to decoding of the random access request" which appears in independent claim 53 which is asserted and from which the other asserted claims depend.

34.     The parties' proposed constructions of this term are set forth below:

| "prior to decoding of the random access request" | |
|---|---|
| **Ericsson's Proposed Construction** | **Apple's Proposed Construction** |
| Plain meaning.  Alternatively, if construction is deemed necessary: "before the complete random access request has been decoded" | "prior to determining any of the information in, or determining the correct timing on the basis of, the random access request" |

35.     The meaning of the phrase at issue is clear from the plain meaning of the words and does not, in my opinion, require further explanation.   I have reviewed the specification and prosecution history of the '992 patent and have found nothing that would suggest to a person of ordinary skill in the art that the inventors intended to convey something other than the plain meaning of the phrase.

36.     I do, however, agree that, if any further explanation of the phrase is required, Ericsson's proposed construction accurately captures the meaning.  Ericsson's proposed construction simply makes clear, contrary to Apple's proposed construction that I discuss below, that decoding of *the* random access request refers to decoding of the complete random access request.

37.     Apple's proposed construction replaces "decoding of" with "determining any of the information in, or determining the correct timing on the basis of."  In my opinion, Apple's proposed construction is incorrect because it includes concepts that are not present in the claim language and blurs the distinction between detection and decoding as these terms are used in the patent specification and understood in the art.

38.     A person of ordinary skill in the art would not understand the meaning of "decoding" to be so broad as to encompass "determining any of the information in" or "determining the correct timing on the basis of."  The term "decoding" to a person or skill in the art means to reverse a prior encoding.  My opinion is confirmed by technical dictionaries.   For example, the relevant definition of "decode" from the respected Authoritative Dictionary of IEEE

VOJCIC DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

Standards Terms, 7th ed. (2000), is "[t]o convert data by reversing the effect of previous encoding."

39.    A person of skill in the art would not consider any means of determining information in a communication to be "decoding."  For example, if one receives a letter, one determines the information in it by reading it and a person of skill in the art would not consider this to involve decoding.  If the message were, however, transmitted using Morse code or encrypted using a cipher algorithm, then determining the information in it would be considered decoding because it would involve reversing the encoding performed by Morse code or the cipher algorithm.

40.    Likewise, determining correct timing on the basis of certain information would not, in general, be considered decoding.  One may, for instance, determine the timing of the arrival of a bus at a bus station by observing time on a watch, with no decoding involved. In the communications art, determining the timing of received signals is routinely done using detection of a predetermined signals, such as the preambles in the '474 patent.

41.    The concept of determining timing by using detection – not decoding – of known signals is well understood by persons of ordinary skill in the art.  For example, Introduction to Digital Communication, by Ziemer & Peterson,  states that "[f]rame synchronization is usually accomplished by the detection of a *unique word*, which is a known pattern of 1s and 0s…." Ex. B (R.E. Ziemer & R.L. Peterson, Introduction to Digital Communication, 2nd ed., Prentice Hall, 2001, at 319).  ("Frame synchronization" is the process of determining the timing of blocks of data known as "frames" by identifying a known bit pattern – the "unique word" referred to by Ziemer & Peterson – that occurs at a known location within the frame such as, for example, at the beginning of each frame.)

42.    Ziemer & Peterson also shows how a "Threshold detector" is used for detecting a unique word in frame synchronization, similarly to the threshold detection unit in one embodiment described in the '474 patent for preamble detection.



**FIGURE 5–9**   A digital correlator for detecting a unique word in frame synchronization.

*Id.* at 320, Fig. 5-9.

43.     As an additional example, in WCDMA networks, when a device first connects to a base station, it must determine the timing of frames and the time "slots" into which frames are divided.  This process is also referred to by those of skill in the art as involving the *detection* of certain code words (akin to the "unique words" in Ziemer and Peterson discussed above).  *See*, *e.g.*,  Ex. C (H. Holma & A. Toskala, WCDMA for UMTS, 3rd ed., Wiley, 2004, at 137 (noting, for example, that "Secondary SCH code word detection" is used to determine frame timing).

44.     The specification of the '474 patent uses the term "decoding" in its usual sense and does not redefine it.  Moreover, the specification of the '474 patent makes a clear distinction between detection and decoding, stating, for example: "Essentially, in accordance with a preferred embodiment of the present invention, a method for processing multiple random access requests is provided whereby a base station transmits an acquisition indicator signal, which indicates that the base station has *detected* the presence of a random access transmission. For this exemplary embodiment, the acquisition indicator is generated based on the amount of energy received (or, possibly, also the interference energy) on the random access channel (e.g., *as opposed to the correct/incorrect decoding* of a random access message)." '474 patent, col. 5:15-24 (emphasis added).

45.     The '474 patent uses the term "decoding" in connection with the decoding by the base station of the message part of a random access request sent by a mobile device.  A person of

skill in the art would recognize that the message part of the random access request will be encoded and a must be decoded to recover the information. For example, U.S. Patent 6,259,724 (hereafter "the '724 patent"), which is incorporated by reference in the '474 patent, describes that forward error correction (FEC) coding, to protect against transmission errors, may be employed for random access message. *See, e.g.*, '724 patent, col. 3:46-52, col. 5:10-12. Such FEC encoding techniques were routinely used in digital communications in the past 30-40 years.

46.     The '474 patent also makes clear that, contrary to Apple's proposed construction, not all determination of information constitutes decoding. For example, the specification describes an embodiment that includes "an exemplary detection section" in the base station for detecting the presence of a random access preamble, as I discussed above. *See* '474 patent, Fig 6 & col. 5:36 – col. 6:2. Some information in the preamble is determined by the detection section; for example, the detection section determines the signature pattern included in the preamble in order to be able to transmit the acquisition indicator corresponding to the signature in the preamble. *See*, *e.g*., '474 patent, col. 6:34-38. But this determination of information, since it does not involve "decoding" as a person of skill in the art would understand the term, is considered part of the detection of the random access request rather than the decoding of it.

47.     This distinction between detection and decoding, which Apple's proposed construction muddles, is also plain in asserted claim 53 in which the clause at issue appears. Claim 53 requires that the mobile device "transmit a preamble part of a random access request, said preamble being dependent on a signature pattern randomly selected from a set of patterns." The mobile device then receives from the base station "an indicator signal associated with the selected signature and indicating that a base station has detected a presence of said random access request." Since the indicator signal is "associated with the selected signature," the base station must necessarily have determined the selected signature included in the preamble. But, the claim specifies that this determination of information in the preamble part of the random access request occurs "prior to decoding of the random access request." The claim thus makes clear that, by "decoding of the random access request," it is referring, as a person of skill in the art would expect, to the decoding of the message part of the random access request and not simply to the determination of information that may be contained in the preamble.

48.     Apple's proposed construction is inaccurate in another way also. According to Apple's construction, "*any*" determination of information in the random access request constitutes "decoding of the random request." Even if the determination of information at issue constituted

-11-                                    Case No. 3:15-cv-00154 JD

VOJCIC DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

decoding, a person of ordinary skill in the art would understand decoding of *the* random access request to refer to decoding of the complete random access request, not just some of the information in it.  This is also the way that the specification uses the term.  For example, the specification refers to the base station sending an "ACK" (acknowledgment) to indicate that "it has correctly decoded the random access message."  '474 patent, col. 3:40-41.  A person of ordinary skill in the art would understand that such an ACK indicating correct decoding of the random message would only be sent once the complete random access message has been decoded, not just some information in it.

### B.   The '992 Patent

49.     I understand that Ericsson is asserting claims 3, 7, 10, and 11 of the '992 patent against certain Apple products.

50.     I understand that the parties dispute the meaning of the phrase "a user terminal identifier indicating a scrambling sequence from a first set of uplink scrambling sequences that are not specifically assigned to a user terminal" which appears in independent claim 1, from which asserted claim 3 depends, and independent claim 7, which is asserted and from which asserted claims 10 and 11 depend.

51.     The parties' proposed constructions of this term are set forth below:

| "a user terminal identifier indicating a scrambling sequence from a first set of uplink scrambling sequences that are not specifically assigned to a user terminal" | |
| --- | --- |
| **Ericsson's Proposed Construction** | **Apple's Proposed Construction** |
| Plain meaning. Alternatively, if construction is deemed necessary: "information that identifies a user terminal and is used to determine a scrambling sequence from among a set of uplink scrambling sequences that are not specifically assigned to a user terminal" | "a user terminal identifier indicating a scrambling sequence from a first set of uplink scrambling sequences of a type that are not specifically assigned to a user terminal" |

52.     The meaning of the phrase at issue is clear from the plain meaning of the words and does not, in my opinion, require further explanation.   I have reviewed the specification and prosecution history of the '992 patent and have found nothing that would suggest to a person of ordinary skill in the art that the inventors intended to convey something other than the plain meaning of the phrase.

VOJCIC DECL. IN SUPPORT OF ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

53.     I do, however, agree that, if any further explanation of the phrase is required, Ericsson's proposed construction accurately captures the meaning.  A "user terminal identifier" is "information that identifies a user terminal." To have the user terminal identifier "indicat[e] a scrambling sequence from a first set of uplink scrambling sequences" means the user terminal identifier "is used to determine a scrambling sequence from among a set of uplink scrambling sequences." Thus, the meaning of the phrase at issue is "information that identifies a user terminal and is used to determine a scrambling sequence from among a set of uplink scrambling sequences that are not specifically assigned to a user terminal," as per Ericsson's proposed construction.

54.     Apple's proposed construction adds the word "of a type" to the phrase at issue, but otherwise leaves it unchanged.  Thus, according to Apple's construction, the scrambling sequence to be used is selected "from a first set of uplink scrambling sequences *of a type* that are not specifically assigned to a user terminal" rather than simply "from a first set of uplink scrambling sequences that are not specifically assigned to a user terminal."  In my opinion, that addition is unnecessary and could result in confusion as to the meaning of the phrase.

55.     One potential understanding of the words "of a type" would add nothing to the meaning of the phrase at issue.  At the time that a scrambling sequence is to be chosen for a particular user terminal, certain scrambling sequences may already have been assigned to other user terminals.  Thus the claims of the '992 patent provide that the scrambling sequence is selected from a set of scrambling sequences "that are not specifically assigned to a user terminal."  Another way to say this would be to say that the scrambling sequences are chosen from those that have the property, namely are "of the type," that they have not already been specifically assigned to a user terminal.  Under this understanding, the words "of a type" are superfluous – they add nothing to the meaning of the phrase.

56.     However, the words "of a type" could also be understood to refer to the embodiment described in the specification that I noted above according to which scrambling sequences are divided into two types – the scrambling sequence used to scramble the third message during the random access process being of a different type than the scrambling sequence that is used thereafter.  This embodiment is discussed, for example, at col. 5:52 – col. 6:5 of the '992 patent, which describes selecting one of a "first type of uplink scrambling sequences" for scrambling a random access message, and then selecting "a second, different type of uplink scrambling sequence" to be used "for subsequent communication with the radio base station,"

57.     A person of skill in the art would not understand the asserted claims of the '992 patent as referring to this embodiment for several reasons. First, those claims, including independent claims 1 and 7, do not refer to the selected scrambling sequence as being of a certain "type"; indeed, the word "type" appears nowhere in the claims. Second, the asserted claims make no reference to the scrambling sequence used to scramble subsequent messages being of a "different type" – to the contrary, there is no reference to the scrambling sequence used to scramble subsequent messages at all. Third, the '992 patent contains other claims directed to the "types of uplink scrambling sequences" embodiment. For example, claim 8 depends from asserted claim 7 and requires that the processing circuitry be "configured to select a second different type of uplink scrambling sequence," thus narrowing the scope of the independent claim by adding limitations to multiple "types" of scrambling sequences.

58.     Because Apple's proposed construction could create confusion as to whether the asserted claims are directed to the embodiment in the patent specification that includes two different types of scrambling sequences, in my opinion it should not be adopted.

I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on 10/11, 2015, in VIENNA, VA.

Branimir Vojcic